PERRY S. LEWIS AND ESTHER LEWIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 530–64.   Filed November 18, 1966.

*Lester M. Ponder*, for the petitioners.
*W. Dean Short*, for the respondent.

TANNENWALD, *Judge:* The respondent determined deficiencies in petitioners' income tax in the amounts of $1,596.87 for 1959, $1,701.45 for 1960, and $1,703.52 for 1961. The only question remaining is whether the proceeds of a redemption of stock shall be treated as capital gain or as a dividend. All other adjustments have been settled by stipulation and will be reflected in a Rule 50 computation.

---

FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Perry S. Lewis and Esther Lewis are husband and wife residing in Crawfordsville, Ind. They filed joint income tax returns on a cash basis with the district director of internal revenue at Indianapolis, Ind., for the taxable years 1959, 1960, and 1961. Any reference herein to "petitioner" shall be deemed to mean Perry S. Lewis.

Petitioner entered the retail automobile business in 1910 and purchased the Ford agency at Crawfordsville, Ind., in 1926. He operated it as a sole proprietorship until 1950, when it was incorporated as Perry Lewis Co., Inc. (hereinafter referred to as the corporation).

Petitioner at all pertinent times understood that Ford Motor Co., because the retail automotive business was highly competitive, was very much interested in having its dealers acquire and keep young blood and young people in the active management of their businesses.

Petitioner likewise planned that his sons would come into the business and one day acquire it from him. John and Perry, petitioner's sons, began working full time in the business about 1946. They were joined by Gene, their youngest brother, after he graduated from college in 1952.

After World War II, the petitioner constantly reduced his role in the active conduct of the business. From 1950 to 1956, petitioner was president and a director, but his services to the corporation were on a diminished scale, consisting for the most part of consulting with his sons and giving them advice regarding the business.

In 1950 when the corporation was organized, the petitioner owned all of the stock. It was his intent to dispose of his stock to his sons at such times as they were able to purchase it. By July 1956, petitioner owned 495 shares, Gene owned 1 share, and John owned the remaining 504 shares.[1]

The petitioner acquired and began to operate a farm in 1941. In 1956, he decided to dispose of all of his interest in the corporation and devote himself to farming. At that time, petitioner was 69 years old.

In June 1956, petitioner offered to sell his 495 shares to the corporation at $100 per share, which was their approximate book value. At special meetings of the board of directors and of the shareholders, held on June 28, 1956, petitioner's offer was accepted. The directors also granted to Gene the right to purchase from the corporation from

---

[1] John had purchased some of his shares from his brother Perry, but the record does not disclose how many shares. Nor does the record disclose how his brother Perry acquired such shares, nor how John acquired his other shares.

time to time a maximum of 250 of the shares to be acquired from petitioner at book value at the time of each purchase.[2]

On July 1, 1956, petitioner entered into an agreement with the corporation which provided that the latter would purchase all of his stock for $49,500. The corporation was to pay petitioner $500 per month with interest at 5 percent per annum on the unpaid balance, with a right in the corporation to pay more than the required monthly amounts. At the end of each year, the total payments to principal were to be calculated and petitioner was required to deliver the number of shares paid for at the rate of $100 per share. The petitioner retained the right to vote any of the shares not paid for and delivered to the purchaser. The agreement provided that the certificates representing petitioner's shares were to be endorsed with a legend referring to the sale of the shares. Following this transaction, there was no basic change in the day-to-day business operations of the corporation.

Commencing July 1, 1956, petitioner's salary of $1,000 per month was discontinued. He resigned as president and was elected vice president of the corporation on June 11, 1956. He retained this position and his position on the board of directors through all of the taxable years in question.[3] After July 1, 1956, petitioner neither performed any services for the corporation nor actively exercised any powers as vice president or director.[4] Petitioner attended informal meetings of the board of directors but did not participate in any of the deliberations. The business was operated solely by John and Gene, although petitioner from time to time inquired generally how business was progressing.

On May 6, 1958, a major medical plan covering the officers of the corporation was considered at a special meeting of the board of directors, and the officers of the corporation were authorized to acquire an appropriate insurance policy.

The corporation has never paid a dividend and had accumulated earnings and profits at the end of 1956 in the amounts of $42,163.41; in 1959, $62,263.82; in 1960, $77,648.15; and in 1961, $86,711.60.

After the respondent had begun an audit of petitioner's income tax returns, petitioner mailed a document dated June 5, 1963, purporting to be an agreement under section 302(c)(2)(A)(iii) of the Internal

---

[2] The record does not disclose whether Gene in fact purchased any shares, although Schedule M of the corporation's Federal income tax returns for 1957 through 1961 shows an item entitled "Gain on Treas. Stock" which, in all probability, represents an adjustment arising out of sales of shares to Gene.

[3] Petitioner was also elected treasurer at the June 11, 1956, board meeting. While the record does not affirmatively disclose when petitioner ceased to hold that office, we think it can fairly be inferred from the testimony, and we therefore conclude, that this occurred prior to the taxable years involved.

[4] Petitioner's inactivity is further evidenced by the fact that, although the minutes of a meeting of the board of directors on May 6, 1958, recite that all directors were present and, by signing the minutes, waived notice, petitioner did not in fact sign the minutes but John and Gene did.

Revenue Code of 1954.[5] Petitioner requested that such document be attached to his 1961 income tax return, but respondent rejected it on the grounds that it was not filed in duplicate and should have contained an agreement to notify the district director of any reacquisition within 10 years from December 31, 1961, instead of July 1, 1956, the date used by petitioner in the document.

In each of the taxable years in issue, 1959, 1960, and 1961, petitioner received principal payments of $10,000 and in exchange delivered 100 shares of stock at the close of each year. In addition to the payments of principal, petitioner received interest payments of $1,394.16 in 1959, $882.00 in 1960, and $351.21 in 1961, which he separately reported on his tax returns for those years. Petitioner's final delivery of 100 shares in 1961 completely terminated his actual stock ownership in the corporation. Petitioner's basis for his shares in 1956 was $61.20 per share, and, as of January 1, 1959, he had an unrecovered cost basis of $18,360 for 300 shares.

The payments received by petitioner in payment for his shares during the taxable years in question were not essentially equivalent to a dividend.

### OPINION

Once again we are faced with the troublesome question whether a distribution by a corporation to a shareholder is "essentially equivalent to a dividend" within the meaning of section 302(b)(1). A finding of nondividend equivalency would dispose of the case and make unnecessary a determination as to whether there was a complete redemption within the meaning of section 302(b)(3) and the subsidiary question whether petitioner complied with the requirements of section 302(c). The pertinent statutory provisions are set forth in the margin.[6]

---

[5] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[6] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

   (b) REDEMPTIONS TREATED AS EXCHANGES.—

     (1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

          \*        \*        \*        \*        \*        \*        \*

     (3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

          \*        \*        \*        \*        \*        \*        \*

   (c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

          \*        \*        \*        \*        \*        \*        \*

     (2) FOR DETERMINING TERMINATION OF INTEREST.—

       (A) In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

         (i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

         (ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

         (iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

At the outset, we emphasize that this case involves a situation where the taxpayer was both a *minority* shareholder and an active participant in the business and that, leaving aside the attribution rules, the transaction herein resulted in the complete termination of such active participation and shareholder interest. We believe that the numerous cases, involving only a partial redemption and where the taxpayer was a *majority* shareholder and it was apparent that he continued in a position of control, are clearly distinguishable.

The fact that petitioner did not immediately surrender all of his stock, but rather did so over a period of 5 years, is not an impediment to the application of section 302(b)(1) if the partial redemptions were but steps in a single transaction. *In Re Lukens' Estate*, 246 F. 2d 403 (C.A. 3, 1957), reversing 26 T.C. 900 (1956); *Jackson Howell*, 26 T.C. 846 (1956), affd. 247 F. 2d 156 (C.A. 9, 1957); *Carter Tiffany*, 16 T.C. 1443 (1951), acq. 1957–1 C.B. 5. An examination of the record convinces us that this was in fact the case. Without contradiction, petitioner testified that it was his long-held intention to retire from the business and allow his sons to purchase it. His conduct for the past 26 years confirms and supports this testimony. Both the provisions of the agreement with the corporation and the conduct of the parties in adhering to its terms convince us that this transaction must be considered in its entirety.

It is clear that, even if there was not a complete redemption under section 302(b)(3) because of petitioner's alleged failure to comply with the provisions of section 302(c), petitioner is not precluded from claiming the benefits of section 302(b)(1). See sec. 302(b)(5). As the report of the Senate Committee on Finance at the time of the enactment of the Internal Revenue Code of 1954 states—

In general under * * * [sec. 302(b)] your committee intends to incorporate into the bill existing law as to whether or not a reduction is essentially equivalent to a dividend under section 115(g)(1) of the 1939 Code, and *in addition* to provide three definite standards in order to provide certainty in specific instances. [Emphasis added. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 233 (1954).]

Thus, any implication from the failure to qualify under the "safe harbor" of section 302(b)(3) is clearly negated. By the same token, the mere fact that, without regard to the attribution rules, complete termination of a shareholder's interest is contemplated or accomplished does not automatically insure protection under the dividend equivalency test of section 302(b)(1). To hold otherwise would make meaningless the specific requirements of sections 302(b)(3) and 302(c). Indeed, it is in this latter regard that the attribution rules have an impact and inhibit the applicability of the cases decided under the 1939 Code. See *Bradbury* v. *Commissioner*, 298 F. 2d 111, 116 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court;

*Estate of Arthur H. Squier*, 35 T.C. 950, 955 (1961), acq. 1961–2 C.B. 5; *Thomas G. Lewis*, 35 T.C. 71, 75–76 (1960).

Turning to the question whether the distributions herein were "essentially equivalent to a dividend" under section 302(b)(1), we recognize that the inquiry is a factual one. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 233–234 (1954). Under such circumstances, it is difficult, if not impossible, to prescribe any set of rules which is susceptible of computerized application. Indeed, the problem of dividend equivalency has had a gremlinesque quality which has endowed it with "as many colors as Joseph's coat." Cf. *Weible* v. *United States*, 244 F. 2d 158, 163 (C.A. 9, 1957). See *Henry McK. Haserot*, 46 T.C. 864 (1966): "The colors of the cloth of dividend equivalency are not completely fast." We must recognize that no two cases are exactly alike and that, at best, we can only hope to provide, in any given case, a modest degree of guidance in a "landscape of shifting sands." Cf. *Wingate E. Underhill*, 45 T.C. 489, 492 (1966).

We think that "the indispensable first step [in determining dividend equivalency] is whether the redemption of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders." See *Bradbury* v. *Commissioner*, *supra* at 116. Obviously where one ceases to be a shareholder, there is such a change in position. But, as we have previously pointed out, something more must be present in order to synthesize the provisions of section 302(b)(1) with those of sections 302(b)(3) and 302(c). There must be some raison d'être for the redemption reasonably related to business exigencies and not founded upon the personal whims of the taxpayer or, in the case of a closely held corporation, upon the machinations of other shareholders whose shares would be attributable to him. Compare *Sorem* v. *Commissioner*, 334 F. 2d 275 (C.A. 10, 1964), reversing 40 T.C. 206 (1963), *Estate of Arthur H. Squier*, *supra*, and *John A. Decker*, 32 T.C. 326 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960), with *Tabery* v. *Commissioner*, 354 F. 2d 422 (C.A. 9, 1965), affirming a Memorandum Opinion of this Court, and *Leon R. Meyer*, 46 T.C. 65 (1966), on appeal (C.A. 8, June 15, 1966). In short, there must be a business purpose.

In the instant case, the petitioner was well along in years. His desire to retire from the business made sense, not only personally and businesswise but also because of the pressures of an independent third party, the Ford Motor Co. Obviously, petitioner's case would have been stronger if these pressures had included a demand that he relinquish ownership as well as withdraw from active management, but there is no suggestion that the position of the Ford Motor Co. was not in fact bona fide, and we think that petitioner's broad rather than literal interpretation of Ford's position was not unreasonable. Peti-

tioner did withdraw both from ownership and management except for formal but inactive retention of his position as an officer and director. Not only did his sons, who had worked with him for several years, succeed to the ownership of the business but they independently took over active management and clearly were not just fronts for petitioner. Finally, there is not a shred of testimony which suggests that the transaction herein was motivated to the slightest degree, either in conception or execution, by reasons of tax avoidance.[7]

Against this background, we see no need to dissect the differences between corporate and shareholder business purpose which have so often troubled the courts. See *Kerr* v. *Commissioner*, 326 F. 2d 225 (C.A. 9, 1964), affirming 38 T.C. 723 (1962), certiorari denied 377 U.S. 963; *Parshelsky's Estate* v. *Commissioner*, 303 F. 2d 14, 21 (C.A. 2, 1962), reversing 34 T.C. 946 (1960); *Ballenger* v. *United States*, 301 F. 2d 192, 198 (C.A. 4, 1962). We hold that, under the limited circumstances herein, there was a "conspicuous countervailing consideration" of business purpose sufficient "to dispel the aura of dividend equivalence." See *Bradbury* v. *Commissioner*, *supra* at 117.

In view of this conclusion, we do not reach the question whether the nominal retention of an officership or directorship violates the provisions of section 302(c)(2)(A)(i). In this connection, we note that petitioner's continuation as vice president of the corporation, even though inactive, would presumably have qualified him to participate in the major medical policy which the corporation's board of directors authorized to be procured. (The record is silent as to whether any such plan was in fact established.) Furthermore, there is an indication that petitioner ceased to be an officer and director in February 1962—a matter of weeks after he received the last payment for his stock. At the very least, this raises the suspicion that his continuation in these posts, while he was receiving payments, had some significance.

Nor do we need to decide whether the agreement which petitioner sought to file with the respondent met the requirements of section 302(c)(2)(A)(iii) and, in particular, whether the 10-year period specified therein ran from July 1, 1956, or December 31, 1961. Cf. *Georgie S. Cary*, 41 T.C. 214 (1963); *Pearce* v. *United States*, 226 F. Supp. 702 (W.D.N.Y. 1964); *Van Keppel* v. *United States*, 206 F.

---

[7] We recognize that the lack of a dividend history and the presence of accumulated earnings and profits is sometimes pointed to as an element in determining dividend equivalency. See, e.g., *Thomas Kerr*, 38 T.C. 723, 730 (1962), affd. 326 F. 2d 225 (C.A. 9, 1964), certiorari denied 377 U.S. 963 (1964); *John A. Decker*, 32 T.C. 326, 331 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960). But, in fact, this element is little more than a guidepost in determining the bona fides of the asserted business purpose and the absence of a tax-avoidance motive. See *Ballenger* v. *United States*, 301 F. 2d 192, 197–198 (C.A. 4, 1962).

Supp. 42 (D. Kans. 1962); *Archbold* v. *United States*, 201 F. Supp. 329 (D.N.J. 1962), affirmed per curiam 311 F. 2d 228 (C.A. 3, 1963).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

SIMPSON, *J.*, concurring: Although I agree with the result reached by the majority, I cannot agree with the reasoning by which it concludes that the distributions in this case were not essentially equivalent to dividends. The Court, I believe, fails to give full effect to the attribution rules and fails to apply properly the tests which have been established for determining when a distribution is essentially equivalent to a dividend.

In this case, we have an individual, who owned 49.5 percent of the stock of a corporation and whose sons owned the remaining stock of the corporation, arranging to have his stock redeemed by the corporation. It may be that if this redemption had occurred before the enactment of the Internal Revenue Code of 1954, the redemption would have been treated as a sale. However, section 302(c)(1) of the 1954 Code provides that the attribution rules of section 318 shall be applied for purposes of section 302. Accordingly, in determining whether this redemption is to be treated as essentially equivalent to a dividend, we must look at it as if the distribution had been made to an individual who owned all of the stock of the corporation. In other cases, this Court has recognized that the attribution rules are now applicable in determining whether a redemption is to be treated as a dividend, *Thomas G. Lewis*, 35 T.C. 71 (1960); *Ralph L. Humphrey*, 39 T.C. 199 (1962), but in this case, the Court refuses to give full effect to those attribution rules.

The majority recognizes that the mere fact that the petitioner wishes to retire from the business is not a sufficient reason to treat the redemption as a sale; yet, the Court finds that there was a business purpose for the redemption, when, in fact, none was established in the record. All that this record shows is that the petitioner believed that the Ford Motor Co. wanted younger people to manage the dealership. However, the petitioner was not at the time of this redemption engaged in the active management of the business, and we were not given any reason why he needed to redeem his stock in order to transfer management into younger hands.

Though I disagree with the reasoning of the majority, I agree with the result because I have concluded that there was a waiver of the attribution rules under section 302(c)(2) and a complete termination of the petitioner's interest within the meaning of section 302(b)(3). I agree with the majority that the several redemptions of the

petitioner's stock should be treated as a single redemption terminating his actual ownership in the corporation. Yet, the question remains as to whether he has met the conditions of section 302(c)(2) so as to waive the application of the attribution rules.

I cannot agree with the respondent's contention that petitioner's position as director and vice president, subsequent to the redemption, violates the condition of section 302(c)(2)(A)(i). I am convinced that petitioner performed no services as an officer or director after June 1956. Even the informal and infrequent consultations which he rendered to the company prior to that time were discontinued after he signed the contract selling his shares to the corporation. Thus, in no way did he serve the corporation or direct its affairs. Moreover, the petitioner was paid no compensation as an officer or director subsequent to the sale.[1] His $1,000-per-month salary as president was terminated at the time of the sale of his shares and termination of his interest and activities. Hence, he did not benefit from the activities of the corporation in any way other than to receive the payments for the redemption of his stock. Cf. *Leon R. Meyer*, 46 T.C. 65 (1966), on appeal (C.A. 8, June 15, 1966) ; Rev. Rul. 59–119, 1959–1 C.B. 68.

As I read section 302(c)(2)(A)(i), it does not provide that every officer or director shall be treated as having retained an interest in a corporation. It provides merely that a retained interest *may* include an interest as an officer or director, but it does not require us to find that every officer or director has retained an interest. The purpose of section 302(c)(2) is to provide that when there is a bona fide severance of the shareholder's interest, he will receive capital gains treatment.[2] On the other hand, although there is no direct judicial authority or statement in the legislative history of section 302(c)(2), I believe that Congress did not intend us to hold that an officer or director who performs no duties, receives no compensation, and exercises no influence has retained an interest in the corporation. It is a fair inference from the section as a whole and from its legislative history that Congress was concerned with the situation in which there was a nominal transfer of stock in a family corporation, although the transferor continued to control the corporation and benefit by its operations. Immediately after the enactment of the 1954 Code, it was recognized that section 302(c)(2)(A)(i) did not prohibit office holding per se, but was concerned with a retained financial stake in the corporation, such as a profit-sharing plan, or in the creation of an ostensible sale that really changed nothing so far as corporate man-

---

[1] I certainly cannot find compensation in the fact that the directors once decided to buy a medical policy for the officers when the record does not show that a policy was purchased or whether it covered the petitioner.

[2] H. Rept. No. 1337, 83d Cong., 2d Sess., p. 36 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., p. 45 (1954).

agement was concerned.[3]   Finally, I believe that form should not be placed above substance, that in substance this petitioner did not retain an interest in the corporation, and that accordingly he has met the condition of section 302(c)(2)(A)(i).[4]

As an additional reason for holding section 302(c)(2) inapplicable, the respondent has argued that the agreement required by section 302(c)(2)(A)(iii) has not been filed, but I do not agree with this argument.   In support of this argument, the respondent contends that the agreement was not filed in accordance with the regulations in that it was not filed in duplicate and was not filed timely.   These regulations provide:

Sec. 1.302-4   Termination of shareholder's interest.

\*       \*       \*       \*       \*       \*       \*

(a) The agreement specified in section 302(c)(2)(A)(iii) shall be in the form of a separate statement in duplicate signed by the distributee and attached to his return timely filed for the year in which the distribution described in section 302(b)(3) occurs.   The agreement shall recite that the distributee has not acquired any interest in the corporation (as described in section 302(c)(2)(A) (i)) since such distribution, and that he agrees to notify the district director for the internal revenue district in which such return is filed of any acquisition of such an interest in the corporation within 30 days after such acquisition if such acquisition occurs within 10 years from the date of such distribution.

In an opinion reviewed by the Court, this Court held that the requirements of section 302(c)(2)(A)(iii) are procedural and directory and compliance with the regulations is not a mandatory condition for the application of section 302(c)(2)(A).   *Georgie S. Cary*, 41 T.C. 214 (1963), nonacq. 1964–2 C.B. 8.   In the *Cary* case, the Court ascertained that section 302(c)(2)(A)(iii) was added by the Senate primarily to enable the respondent to require the distributee to maintain records fully identifying the amount of tax payable had the redemption been treated as a dividend.   In that case, the Court held that a substantial compliance with the Code was all that is necessary—it is not necessary to comply literally with all the rules of the regulations. If the distributee fully reports his income from the distribution, he may comply with the Code by filing an agreement when his inadvertence is brought to his attention, even at a time when his returns are being audited.   *Van Keppel* v. *United States*, 206 F. Supp. 42 (D. Kans. 1962), affd. 321 F. 2d 717 (C.A. 10, 1963).   I believe that the petitioner substantially complied with the requirements of section 302 (c)(2)(A)(iii).   Rejection of petitioner's agreement because it did not accompany the return, because it was not in duplicate, or because

[3] Bittker, Stock Redemptions and Partial Liquidations Under the Internal Revenue Code of 1954," 9 Stanford L. Rev. 13, 33, fn. 72 (1956).

[4] The majority opinion states that the record contains an indication that petitioner resigned his positions in 1962 and that such an indication gives rise to a suspicion that his offices had significance.   I can see other explanations of this resignation, if it occurred, and consequently do not attach much significance to it.

the return was not timely was an abuse of discretion. *Pearce* v. *United States*, 226 F. Supp. 702 (W.D.N.Y. 1964).[5]

Respondent has also asserted that petitioner's agreement is improper because it should have promised to notify the district director of any reacquisition within 10 years commencing on December 31, 1961. Petitioner's tendered agreement specified July 1, 1956, as the date for the beginning of the 10-year period. However, I cannot find that petitioner's agreement was inconsistent with the Code or with respondent's regulations. The regulations make no provision expressly for distributions which occur in more than 1 taxable year. I do not understand the existing regulations to require the filing of an agreement every year. In this case, the petitioner treated the redemption as occurring on July 1, 1956, and treated the 10-year period as beginning to run after that date; for purposes of preparing and filing the agreement, I think that this is not an unreasonable interpretation of the regulations.

Accordingly, I would find that the terms of section 302(c)(2) were met, and the stock owned by the petitioner's sons should not be attributed to the petitioner for the purpose of section 302(b)(3). I am aware that section 302(c)(2)(B)(ii) might apply to this case and require us to apply the stock attribution rules.[6] Indeed, the facts presented suggest that there may have been a disposition of the type described in that provision. However, the respondent has not argued that such a disposition occurred, and the record shows clearly that the parties did not consider that provision to be an issue in this case.

Therefore, I would limit the holding in this case to a decision for the petitioner under section 302(b)(3).

ATKINS, *J.*, agrees with this concurring opinion.

---

[5] *Archbold* v. *United States*, 201 F. Supp. 329 (D.N.J. 1962), affirmed per curiam 311 F. 2d 228 (C.A. 3, 1963), appears to be the only case suggesting a contrary result, and its rationale was seriously questioned in *Georgie S. Cary*, 41 T.C. 214.

[6] Section 302(c)(2)(B), in pertinent part, provides that:

(B) Subparagraph (A) of this paragraph shall not apply if—

\* \* \* \* \* \* \*

(ii) any person owns (at the time of the distribution) stock the ownership of which is attributable to the distributee under section 318(a) and such person acquired any stock in the corporation, directly or indirectly, from the distributee within the 10-year period ending on the date of the distribution, unless such stock so acquired from the distributee is redeemed in the same transaction.

The preceding sentence shall not apply if the acquisition (or, in the case of clause (ii), the disposition) by the distributee did not have as one of its principal purposes the avoidance of Federal income tax.