ESTATE OF MILTON S. LENNARD, DECEASED, PAULINE LENNARD AND GERALD L. LENNARD, EXECUTORS, AND PAULINE LENNARD, INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2011–70. Filed January 29, 1974.

*Abraham S. Guterman*, for the petitioners.
*Larry Kars*, for the respondent.

GOFFE, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the years 1965 and 1966 in the respective amounts of $67,059.55 and $69,292.53. The issues for decision are (1) whether the redemption of all of Milton S. Lennard's stock in Gerald Metals, Inc., constituted a complete termination of his interest in the corporation under sections 302(b)(3) and 302(c)(2) [1] when he continued to render accounting services to the corporation after the redemption, and (2) whether the redemption of the stock constituted a transaction which was essentially equivalent to a dividend under section 302(b)(1).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Milton S. Lennard (hereinafter referred to as Milton or the decedent) and Pauline Lennard filed joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue at New York, N.Y.

The decedent's son, Gerald L. Lennard (Gerald), established and incorporated Gerald Metals, Inc. (Metals), on April 17, 1962, under the laws of the State of New York to engage in the nonferrous metal brokerage business. Gerald had previously served as vice president of Intercontinental Metal Co., an adjunct of a London metal-trading house, but terminated his relationship with the company in order to establish his own business after he was denied an equity participation and the top executive position in the family-controlled company.

Gerald's initial investment in Metals was $100,000. On May 1, 1962, Milton contributed $100,000 and received 750 preferred shares and 2,500 common shares of the newly organized corporation. The purchase price was $100 per share for the preferred shares and $10 per share for the common shares and was paid in cash. An additional contribution of $75,000 was made by two unrelated individuals, Herbert Singer and Robert A. Mackie. The total stock ownership of Metals at the time of incorporation was as follows:

| Shareholder | Preferred | Percentage | Common | Percentage |
|---|---|---|---|---|
| Gerald L. Lennard | 750 | 37.5 | 2,500 | 33⅓ |
| Milton S. Lennard | 750 | 37.5 | 2,500 | 33⅓ |
| Herbert Singer | 250 | 12.5 | 1,250 | 16⅔ |
| Robert A. Mackie | 250 | 12.5 | 1,250 | 16⅔ |

[1] All statutory references herein are to Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Upon the incorporation of Metals, Gerald was elected president and Milton served as secretary-treasurer of the corporation. Both men also served on the board of directors of Metals. At the time of his investment in Metals, Milton was a certified public accountant and practiced under the name of Milton S. Lennard & Co., a sole proprietorship. He was retained as an accountant to perform accounting services for Metals.

The accounting services performed by Milton included the reconciliation of bank statements, the rendition of monthly trial balances and financial statements, and the verification of inventories. Verification of inventories consisted of verifying the position of the corporation as long or short on a commodity by means of an auditing operation which determined the accuracy of the bookkeeping figures relating to the inventories. The actual inventories were in warehouses or in transit and were held largely by customers, suppliers, and refiners. Milton also established accounting procedures for Metals' trading of commodity futures for individuals, which Metals handled to a limited extent. For the period from May 1, 1962, through April 30, 1964, Milton charged Metals $3,500 for services rendered. He thereafter received $250 per month until May 1965 for accounting services rendered to Metals.

Certified financial statements for Metals for the fiscal years ended April 30, 1963, and April 30, 1964, were prepared by the accounting firm of Lakin & Resnick at Milton's request. In May 1965, Milton entered into an accounting partnership with Ralph Resnick and Bernard Ratowitz under the name of Lennard, Resnick & Co. His partnership interest was 48 percent. The firm thereafter performed accounting services for Metals until 1970, the year of Milton's death. At no time was there a contractual relationship between Metals and Lennard, Resnick & Co. for the performance of the accounting services.

As managing partner of the Metals' account, Milton performed monthly audits of the corporation. The services were of an analytical nature and were performed over a period of several days during the month. In addition, the corporate tax returns were usually prepared by Milton, although some were prepared by Bernard Ratowitz and signed by the accounting firm. The fees paid by Metals to the accounting firm were $250 per month from April 1965 through November 1965. Due to an increase in the volume of business necessitating additional auditing services, the fee was thereafter increased to $500 per month and was reported as part of the gross receipts of the partnership.

Lennard, Resnick & Co. performed the annual audits and prepared the financial reports for Metals for the fiscal years ended April 30, 1965, and April 30, 1966. Annual audits of the corporation were thereafter performed by S. D. Leidesdorf & Co. (Leidesdorf) because the corporation's growth necessitated a large independent accounting firm, and because its banker wanted a large independent auditor to be retained for the annual audit. Metals was not in a position to employ Leidesdorf for the monthly audits because of the expense involved.

During its first 5 years Metals' operations showed the following results:

| Year | Net sales | Net profit before taxes | Net profit after taxes |
|------|-----------|-------------------------|------------------------|
| Apr. 30, 1963 | $6,500,000 | $29,700 | $19,700 |
| Apr. 30, 1964 | 6,100,000 | 55,400 | 34,600 |
| Apr. 30, 1965 | 20,200,000 | 607,000 | 314,000 |
| Apr. 30, 1966 | 35,200,000 | 1,900,000 | 1,000,000 |
| Apr. 30, 1967 | 46,700,000 | 867,000 | 410,000 |

The growth of Metals was attributable to the efforts of Gerald, who alone managed the company. The other shareholders did not participate in the management, operation, or policymaking of the business.

In 1965, Gerald decided to buy out all of the other shareholders since they were not producing any revenues or income for the company. After some persuasion, Milton agreed to sell his shares to the corporation. The other two shareholders refused to sell their shares to the corporation. Singer and Mackie, however, were willing to agree to sell a sufficient number of shares to Gerald so as to restore themselves to their original one-third interest in the corporation after the redemption of Milton's shares.

On September 23, 1965, Milton resigned as an officer and director of Metals. But he continued to perform the same accounting services for Metals as a partner in the accounting firm of Lennard, Resnick & Co. until the time of his death in 1970. Metals redeemed all of Milton's stock for an aggregate price of $275,000, of which $75,000 was paid for the preferred stock at par value and the balance of $200,-000 for the common stock at book value of $80 per share. A payment of $125,000 was made to Milton on October 1, 1965. The payment of the remaining balance of $150,000 was deferred until January 10, 1966, and was evidenced by a subordinated promissory note payable to Milton, although the corporation at all times during the 3-month period possessed sufficient funds to pay off the note. The note, which was paid in full on the due date, was subordinated so that Metals

would not be compelled to report the indebtedness to its bankers. The indebtedness evidenced by the note was subordinated to all debts of Metals, whether outstanding on the date of the note or incurred afterwards.

After the redemption of Milton's shares, the outstanding common and preferred shares of Metals were owned as follows:

| Shareholder | Preferred | Percentage | Common | Percentage |
|---|---|---|---|---|
| Gerald L. Lennard | 750 | 60 | 2,500 | 50 |
| Herbert Singer | 250 | 20 | 1,250 | 25 |
| Robert A. Mackie | 250 | 20 | 1,250 | 25 |

Metals adopted a plan of recapitalization on October 21, 1965, whereby all of its outstanding preferred shares were to be converted into common shares. Pursuant to the plan each preferred share was exchanged for 1.2514 common shares. The outstanding common shares immediately after the recapitalization were owned as follows:

| Shareholder | Common stock | Percentage |
|---|---|---|
| Gerald L. Lennard | 3,438 | 52.4 |
| Herbert Singer | 1,563 | 23.8 |
| Robert A. Mackie | 1,563 | 23.8 |

In 1965 or 1966 Metals purchased a secondary lead smelter. Milton advised Gerald with respect to the acquisition, and the two men together examined the refinery's balance sheets. The decision to purchase the refinery was made by Gerald.

Metals established a pension plan in 1965 at the instigation of Gerald. Milton was designated as trustee of the plan and served in such capacity until the time of his death. Milton was never a beneficiary under the plan.

On March 11, 1966, Gerald acquired 938 common shares from Singer and Mackie for $75,000, the book value of the shares computed on a basis of $80 per share, which was considered a fair price by the sellers. After the purchase Gerald owned two-thirds of the outstanding common shares of Metals, and Singer and Mackie each owned one-sixth of the remaining shares.

Milton furnished information to a revenue agent on behalf of the corporation in a Federal tax examination conducted by the respondent in 1968.

In 1970, Gerald retained an accountant from Leidesdorf to act as treasurer of the corporation. Milton and the treasurer together established an accounting procedure which attempted to prevent the theft or loss of the corporation's inventories. The treasurer also succeeded

in devising an internal auditing program whereby a monthly audit was rendered unnecessary. After Milton's death the corporation did not retain an accountant to perform a monthly audit.

The retained earnings of Metals for its fiscal years ended April 30, 1966 and 1967, were $1,093,246.57 and $1,551,248.85, respectively.

In his statutory notice of deficiency the respondent determined that the amounts distributed to Milton in 1965 and 1966 constituted dividends rather than distributions in redemption of his preferred and common shares of Metals.

An agreement to notify the district director of internal revenue at New York, N.Y., of any reacquisition of an interest in Metals within 30 days after such acquisition if occurring within 10 years from the date of disposition was attached to Milton's 1965 Federal income tax return.

## OPINION

We must first decide whether the decedent (Milton) had eased himself into the "safe haven" provided by section 302(b)(3)[2] so that the redemption of his stock should be treated as a distribution in full payment for the stock, thus entitling him to capital gains treatment upon the redemption. If under the attribution rules a complete termination of Milton's interest in Metals was not effected by the redemption, then we must decide whether or not the redemption of his stock was essentially equivalent to a dividend under section 302(b)(1).

The decedent contributed $100,000 to the capital of Metals, which provided him with a one-third ownership of the total outstanding common stock of the corporation and a somewhat greater percentage of its preferred stock. His son, Gerald, contributed the same amount to the corporation, while the remaining contributions were made by

---

[2] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

    \*        \*        \*        \*        \*        \*        \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

    \*        \*        \*        \*        \*        \*        \*

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

    \*        \*        \*        \*        \*        \*        \*

(2) FOR DETERMINING TERMINATION OF INTEREST.—

(A) In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

two unrelated individuals. From the outset of Metals' incorporation the decedent served as its secretary-treasurer and director and provided accounting services to the corporation. After the business had shown substantial growth, Gerald succeeded in persuading his father to sell his stock to the corporation so that Gerald could thereby obtain a greater equity participation in the corporation commensurate with the managerial efforts he was expending in its behalf. Prior to the redemption, Milton resigned as an officer and director of Metals and joined an accounting firm. As managing partner in charge of the Metals' account for that firm, he continued to render accounting services to the corporation after the redemption.

Section 302(c)(2) provides that the attribution rules shall not apply to the redemption of all of the shares of stock of the corporation owned by the shareholder where the distributee, immediately after the distribution, "has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor"; the distributee does not acquire any such interest within 10 years from the date of the distribution; and an appropriate agreement to notify the Secretary of any such acquisition is filed by the taxpayer. The petitioners' position is that the performance of accounting services by Milton for the corporation subsequent to the redemption and the reception by Milton of a portion of the redemption proceeds in the form of a subordinated promissory note did not constitute an "interest in the corporation" other than an interest as a creditor. Relying upon Rev. Rul. 70-104,[3] 1970-1 C.B. 66, the respondent argues that Milton's interest in Metals was not completely terminated after the redemption.

Even if the revenue ruling were controlling, which it is not, we think the facts of this case are different. Milton performed monthly accounting services for the corporation as a certified public accountant and member of an independent accounting partnership. The services were of a prescribed nature and were far more circumscribed than the broader consultant and advisory services rendered by the taxpayer in the revenue ruling. There was no employment contract involved here so that the relationship between Metals and the accounting firm could have been terminated at any time. Moreover, we do not have here a father who is attempting to transfer his business to his son and continue to retain control of its operation. Rather, we have a situation where a son has established a successful business with the financial co-

---

[3] Rev. Rul. 70-104 portrays the redemption of the father's stock in a family corporation owned by himself and his children. The corporation and redeeming shareholder entered into a 5-year consulting agreement which provided that the father would perform consultant and advisory services to the corporation in exchange for specified compensation. The revenue ruling states that the performance by the father of services pursuant to the consulting agreement is an interest in the corporation prohibited by sec. 302(c)(2)(A)(1).

operation of his father, and the father is in a position to provide services to the corporation in an independent capacity after his stock ownership and interest therein have been severed.

Two preliminary questions to be resolved are (1) whether Milton's relationship with Metals was that of an employee or independent contractor, and (2) whether one rendering services to a corporation as an independent contractor can be considered as having an "interest in the corporation."

Milton's relationship with Metals was clearly not that of an employee. After the redemption, he was a partner in an independent public accounting firm and rendered accounting services to the corporation as a member of that firm. See sec. 31.3401(c)-1(c), Employment Tax Regs. While performing audits of Metals, Milton was not subject to its control except as to the product or result of his work. As an accountant, he carried on an independent employment pursuant to an arrangement with Metals by which he had complete control of his designated accounting work and the manner of its performance. He thus functioned in the capacity of an independent contractor.[4] While it is true that a person may be an independent contractor as to certain work, and an employee or agent as to other work for the same employer which is not embraced within the independent contract, there is no evidence here that any of the work performed by Milton after the redemption of his stock was performed in the capacity of an employee. The advice he gave with respect to the purchase of a refinery after an examination of its balance sheets was not provided pursuant to an employee relationship.

In our judgment Congress did not intend to include independent contractors possessing no financial stake in the corporation among those who are considered as retaining an interest in the corporation for purposes of the attribution waiver rules. As pointed out in *Perry S. Lewis*, 47 T.C. 129, 137 (1966), it is reasonable to infer from section 302(c)(2) and its legislative history [5] that Congress was primarily concerned with the situation where a transferor retained a financial stake in the corporation or continued to control the corporation and benefit by its operations after making only a nominal transfer of stock. It is apparent that by the use of the word "interest," Congress had in mind a corporate involvement greater than that attributable to a third party providing goods or services to the corporation. In fact, the statute

---

[4] Whether or not an accountant is deemed to be "independent" in a particular accounting activity for purposes of the established ethics of the accounting profession or as a requirement of certain governmental regulations is not determinative of the employment relationship of the accountant for Federal tax purposes in this case.

[5] H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 36, a75 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 45, 237 (1954).

specifically excludes creditor interests from those prohibited by the attribution waiver rules contained in section 302(c).

The main thrust of the respondent's argument is that Milton performed substantial duties for compensation which greatly influenced the corporation. See *Perry S. Lewis, supra* at 137. The record simply does not support this contention. The services performed monthly by Milton were no more substantial than those which would have been performed by any other independent accountant. The influence exerted by Milton over his son has been grossly exaggerated by the respondent. Metals was founded by Gerald, managed entirely by him, and all policy decisions were made by him. It is our view that the success of the corporation was directly attributable to the efforts of Gerald rather than to the services provided by Milton as accountant. Furthermore, the increase of fee from $250 to $500 per month charged by Lennard, Resnick & Co. was reasonable in light of the increased growth of Metals at that point in time, which necessitated increased accounting work. Unlike the taxpayer in *Beatrice Levin,* 47 T.C. 258, 264 (1966), aff'd. 385 F. 2d 521, 528 (C.A. 2, 1967), Milton did not continue to receive as much or more from the corporation after the redemption as before since all of his legal rights other than a creditor interest in the corporation were surrendered, and his access to corporate benefits was terminated.

Milton's share in the partnership's fee, which amounted to $240 per month after 1965, surely did not provide him with a dependence upon or interest in Metals greater than that assumed by a creditor. There is no evidence that the fee was keyed to the net profits of the corporation. Milton's designation as trustee of Metals' pension plan was not a prohibitive interest but more indicative of his independent relationship with the corporation. At no time was Milton a beneficiary under the plan. Finally, Milton furnished information to respondent on behalf of Metals during a tax examination in 1968 in his capacity as an accountant of an independent accounting firm responsible for the monthly audits rather than as an employee or agent under the control of Metals. Such activity does not even constitute practice before the respondent.[6]

A portion of the decedent's redemption payment, $150,000, was evidenced by a promissory note and deferred for approximately 3 months. The execution of the note established a creditor-debtor relationship between him and Metals as of the date of the redemption. The note possessed substantial economic reality as a debt obligation of the corporation and did not constitute capital subject to the risks of the business, i.e., a proprietary interest. The note provided for annual

---

[6] 31 C.F.R., sec. 10.2(a) (1966).

interest payments of 4 percent and clearly manifested the parties' intent that an "unconditional and absolute" indebtedness was created, with all remedies upon default being accorded to the creditor. While the note possessed no definite maturity date, an ascertainable due date was within the control of Milton because of its nature as a demand instrument. *Piedmont Minerals Co.* v. *United States,* 429 F. 2d 560, 563 (C.A. 4, 1970). The note was in fact repaid within a short period of time, and at all times while the note was outstanding, the corporation had sufficient funds to pay the indebtedness.

The subordination of the note to other debts of Metals did not destroy the decedent's creditor relationship. Subordination of an instrument is only one of many criteria, no one of which is solely determinative, which have been enunciated by the courts. *John Kelley Co.* v. *Commissioner,* 326 U.S. 521 (1946). The subordination was not a condition for obtaining bank loans, but was exacted so that the note would not have to be reported to Metals' bankers. The corporation was thus in a legal and financial position to repay the loan at any time and did so prior to the repayment of its other loans. In any event "debt is still debt despite subordination." *Kraft Foods Co.* v. *Commissioner,* 232 F. 2d 118, 125–126 (C.A. 2, 1956).

The requirement in the regulations pertaining to section 302(c)(2)(A)(i) that the creditor's claim "must not be subordinate to the claims of general creditors" must be read conjunctively with the preceding part of the sentence wherein it is stated that "Such claim must not in any sense be proprietary." [7] When various other factors militate in favor of an instrument's treatment as an equity participation *and* subordination to general creditors is present, the instrument may constitute a proprietary interest. However, all the other facts and circumstances in this case are indicative of a creditor interest so that the decedent cannot be said to have retained any interest in Metals subsequent to his redemption other than a creditor interest of limited duration.

In view of our conclusion that the redemption was a complete termination of the decedent's interest in the corporation under section 302(b)(3), taking into account the attribution waiver provisions of

[7] Sec. 1.302–4 (d), Income Tax Regs., provides as follows:

Sec. 1.302–4  Termination of shareholder's interest.

(d) For the purpose of section 302(c)(2)(A)(i), a person will be considered to be a creditor only if the rights of such person with respect to the corporation are not greater or broader in scope than necessary for the enforcement of his claim. Such claim must not in any sense be proprietary and must not be subordinate to the claims of general creditors. An obligation in the form of a debt may thus constitute a proprietary interest. For example, if under the terms of the instrument the corporation may discharge the principal amount of its obligation to a person by payments, the amount or certainty of which are dependent upon the earnings of the corporation, such a person is not a creditor of the corporation. Furthermore, if under the terms of the instrument the rate of purported interest is dependent upon earnings, the holder of such instrument may not, in some cases, be a creditor.

section 302(c)(2), we need not consider the respondent's contention that the redemption was essentially equivalent to a dividend under section 302(b)(1).

*Decision will be entered for the petitioners.*