MICHAEL N. CERONE AND HELEN E. CERONE,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

STOCKADE CAFE, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 1683-80,  1684-80,      Filed July 1, 1986.
28696-81, 27979-82.

1

*David E. Pavel*, for the petitioners.
*Leonard A. Hammes*, for the respondent.

PARKER, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner(s) | Taxable year(s) ending | Deficiency |
|---|---|---|---|
| 1683-80 | Michael N. Cerone and Helen E. Cerone | Dec. 31, 1974 | $12,742.00 |
| | | Dec. 31, 1976 | 2,436.00 |
| 1684-80 | Stockade Cafe, Inc. | Sept. 30, 1975 | 2,595.36 |
| | | Sept. 30, 1976 | 2,711.47 |
| 28696-81 | Michael N. Cerone and Helen E. Cerone | Dec. 31, 1975 | 9,502.00 |
| 27979-82 | Michael N. Cerone and Helen E. Cerone | Dec. 31, 1977 | 2,726.00 |
| | | Dec. 31, 1978 | 2,934.00 |
| | | Dec. 31, 1979 | 3,195.00 |

After concessions,[1] the issues for decision are as follows:

---

[1]Petitioner Stockade Cafe, Inc., conceded that its taxable income for its taxable year ending Sept. 30, 1975, should be increased by the amount of $2,278 to reflect that claimed repair expenses in the amount of $2,092 were nondeductible capital expenditures and that claimed repair expenses in the amount of $186 were paid during a prior taxable year. In its petition, the corporate petitioner also alleged that if such claimed repair expenses were nondeductible capital expenditures, then respondent erred by not allowing petitioner an investment credit with respect thereto. Petitioner presented no evidence on this issue, nor did it argue the matter on brief. We need not address this issue because petitioner failed to meet its burden of proof and/or conceded the issue. See Rule 149(b), Tax Court Rules of Practice and Procedure.

In the statutory notice for 1974, respondent determined that petitioner Michael N. Cerone constructively received a $25,000 downpayment for his stock in the corporate petitioner during 1974. (Docket No. 1683-80.) In the statutory notice for 1975, respondent took the inconsistent position that petitioner received the payment during 1975. (Docket No. 28696-81.) On brief, respondent concedes that petitioner received the payment during 1975, and has therefore conceded the deficiency for 1974; however docket No. 1683-80 also involves a deficiency for the year 1976 which remains at issue.

(1) Whether distributions received by petitioner Michael N. Cerone from petitioner Stockade Cafe, Inc., in redemption of his stock in the corporation should be treated as being received in exchange for such stock under section 302(a)[2] or as dividends under sections 302(d), 301, and 316. Resolution of this issue depends on whether the redemption qualifies as being not essentially equivalent to a dividend under section 302(b)(1) or, alternatively, as a complete redemption of all of his stock under section 302(b)(3). These determinations in turn involve the family attribution rules of section 318(a)(1) in a context of family hostility.

(2) Whether petitioner Stockade Cafe, Inc., can deduct the portion of such distributions it designated as interest as such under section 163. The parties agree that resolution of the first issue is determinative of this issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Michael N. Cerone and Helen E. Cerone (collectively, the individual petitioners) resided in Omaha, Nebraska, at the time they filed their petitions in this case, except that petitioner Michael N. Cerone resided in Gretna, Nebraska, at the time they filed the petition in docket No. 27979-82. Petitioner Stockade Cafe, Inc. (the corporation), a Nebraska corporation, had its principal office at 13325 Millard Avenue, Omaha, Nebraska, at the time it filed its petition in this case. The individual petitioners filed joint Federal individual income tax returns (Forms 1040) for the years 1974 through 1979 with the Internal Revenue Service Center in Ogden, Utah. The corporation filed Federal corporation income tax returns (Forms 1120) for its taxable years ending September 30, 1975 and 1976, with the Internal Revenue Service Center in Ogden, Utah.

In the years prior to 1963, petitioner Michael N. Cerone (petitioner or "Mike") and his son (Michael L. Cerone or "Mick") worked together as painting and decorating con-

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.

tractors.[3] In March of 1963, petitioner, his son, and their acquaintance, Dan Malone, purchased the assets (including appurtenant real estate and liquor license)[4] of a restaurant and bar (individually, the restaurant or the bar; collectively, the business) known as the Stockade Cafe. The business was located at 13325 Millard Avenue, in what was then Millard and is now part of Omaha, Nebraska. The three men operated the business as equal partners for approximately 1 year until Dan Malone withdrew from the partnership. Thereafter, petitioner and his son operated the business as equal partners.

On or about October 1, 1964, petitioner and his son organized petitioner Stockade Cafe, Inc. (the corporation), and transferred thereto the assets of the business (including appurtenant real estate and liquor license). They each purchased 50 shares of the corporation's common stock for $5,000. These shares were the only outstanding shares of stock in the corporation. Petitioner and his son also became the directors and the president and secretary/treasurer, respectively, of the corporation. They maintained their respective ownership interests in and positions with the corporation until at least November 7, 1974.

Throughout the period of joint ownership, petitioner and his son were both very actively involved in managing the business. Petitioner ran the cash register and supervised the waitresses in the restaurant. He had authority to sign the corporation's checks. For awhile, petitioner also ordered supplies for the business, but his son soon assumed that responsibility. Petitioner's son ran the restaurant's kitchen and the bar. He also kept the corporation's books. Petitioner and his son shared responsibility for major management decisions and for hiring and firing personnel.

During the years 1971 through 1974, the corporation paid petitioner an annual salary and bonus as follows:

| Year | Salary | Bonus |
|------|--------|-------|
| 1971 | $13,800 | $21,156 |
| 1972 | 13,200 | 23,452 |

---

[3] However, for a few months during 1958, petitioner operated "a little hamburger joint" on South 24th Street, in what was then Millard and which in 1970 or 1971 became part of Omaha, Nebraska. He disposed of the business because he was losing money.

[4] The license is a class "C" liquor license, subject to annual renewal.

| Year | Salary | Bonus |
|------|--------|-------|
| 1973 | $14,400 | $27,758 |
| 1974 | 14,400 | 27,660 |

The corporation paid petitioner's son an annual salary and bonus during those years in amounts equal to those it paid petitioner.

Under the joint management of petitioner and his son, the business steadily grew. They expanded the facilities to accommodate this growth. Petitioner and his son completely remodeled the restaurant and the bar and also put in a new kitchen. By 1974, the corporation employed between 50 and 60 employees. Approximately 175 patrons could be seated in the restaurant. Between 60 and 70 patrons could be seated in the bar. The restaurant and the bar were usually open from 10 in the morning until 1 a.m.

Despite their success, petitioner and his son disagreed about the management and operation of the business. As the years went by, the conflicts between the two increased in frequency and intensity. They disagreed about a number of matters. Petitioner refused to follow operating rules for employees that his son had established and that the son and the other managers were trying to enforce. Petitioner frequently reinstated employees that Mick or another manager had dismissed or reprimanded. Since a large number of the corporation's employees worked only part time, Mick and the other managers thought it extremely important to establish well-defined rules for the employees and to rigidly adhere to those rules. Petitioner's failure to follow the rules in such circumstances increased the growing hostility between him and his son.

Petitioner and his son also argued over expanding the business' facilities. Mike wanted to go slow on expansion. Mick favored expansion on a much larger scale than did his father. In particular, they disagreed about the new kitchen they put in. After petitioner's son became the sole shareholder of the corporation, he had this kitchen completely remodeled to his satisfaction.

The greatest source of discord between Mike and Mick resulted from the father's gambling activities. For many

years, Mike held big gambling games in a relatively large apartment[5] located on the second floor of the building[6] that housed the restaurant and the bar. Over the years the gambling games got larger to the point that nothing smaller than a $20 bill was on the table during the games. Twice, the Omaha vice squad raided the building in search of betting slips or other evidence of petitioner's gambling activities. During one such raid, members of the vice squad ransacked the upstairs apartment. They searched for betting slips in the office that was also located on the second floor of the building. They also asked petitioner's son to open the safe in the office, which he did, but they failed to find any evidence of gambling. As they left the premises, the frustrated vice squad members walked through the restaurant and the bar and pulled out the telephones.[7] Shortly after this raid, a representative of the Nebraska Liquor Control Commission visited petitioner's son and said to him, "Mick, you're going to have to get your father out of here or you ain't going to have no liquor license." Without a liquor license, both the restaurant and the bar business would have been ruined. After this, petitioner and his son "could not get along at all." Petitioner's son was deeply concerned about losing the liquor license.[8]

Sometime after the second vice squad raid and the informal liquor commission warning, in late 1973 or early 1974, Mick told his father that one of them should buy out the other's ownership interest in the corporation. Petitioner did not think he could run the business without his son. Therefore, petitioner tentatively agreed to allow the corporation to redeem his stock therein, but he and his son haggled about the price for several months.

---

[5] Although petitioner may have lived in the apartment at some point, one of the corporation's managers, Eunice Marty Postma, (Eunice Postma) and her husband lived there during the time period in which the gambling games occurred.

[6] The building was approximately 70 years old. It had two floors. The restaurant and the bar were located on the first floor. An office used by petitioner's son in connection with the business and an apartment were located on the second floor. The entrance to the second floor was just inside the front door of the building, so that a person walking into the restaurant or the bar would walk past the upstairs door before reaching the restaurant or the bar.

[7] Twenty to twenty-five percent of the restaurant's business consisted of carryout orders that were phoned in by customers, and this business was briefly interrupted by this incident.

[8] This concern was reflected in the terms of the redemption agreement by which the corporation agreed to redeem petitioner's stock, subject to the granting of a renewed liquor license for the license year commencing May 1, 1975. As noted above, note 4 *supra*, the liquor license was subject to annual renewal.

Petitioner and his son hotly negotiated the terms of the redemption, especially the price petitioner would receive for his stock in the corporation. They met together with their attorney, Tom Kelley (Kelley), in Kelley's office between 6 and 8 times to negotiate the redemption. A number of these meetings ended with either Mike or Mick "blowing up" and walking out of the meeting. Sometimes, petitioner or his son would meet separately with Kelley to discuss the redemption. Although they both continued to work at the restaurant and the bar, petitioner and his son sometimes were not speaking to one another, and their relationship was volatile. Finally, after almost a year of negotiations, on November 7, 1974, petitioner and the corporation entered into an agreement (the redemption agreement)[9] whereby petitioner and

---

[9] The redemption agreement provides as follows:

### AGREEMENT

THIS AGREEMENT is entered into this 7 day of November, 1974, between MICHAEL N. CERONE, hereinafter called Seller, and STOCKADE CAFE, INC., a Nebraska corporation, hereinafter called Buyer, of the corporate stock of STOCKADE CAFE, INC.

The Stockade Cafe, Inc. owns and operates a bar and restaurant at 13325 Millard Avenue, Omaha, Nebraska, formerly known as Millard, Nebraska.

The parties to this agreement state that the total of the outstanding shares of stock in the corporation as of this date are: Michael N. Cerone, 50 Shares, and Michael L. Cerone, 50 shares.

The Seller agrees to sell to the Buyer, 10 shares of the stock of the corporation as of October 1, 1974, and the balance of 40 shares of the stock of the corporation as of May 1, 1975, under the following terms and conditions:

The total sum of $125,000.00, payable as follows: $25,000.00 down, receipt of which is hereby acknowledged, and the balance of $100,000.00 payable over a period of seven years in equal semi-annual payments due on May 1st and December 1st of each year, commencing on May 1, 1975, with interest at the rate of 6 1/2% per annum on the unpaid balance.

The Seller agrees not to compete in the liquor business within a five mile radius, and seller further agrees not to enter into the restaurant business in any manner within a ten mile radius of the Millard location set forth above for a period of five years. The five year period does not apply to the liquor business.

The Seller shall further be entitled to one half of the cash kept in savings accounts in the corporate name as of October 1, 1974, plus the amount of the yearly bonus for the year ending September 30, 1974, as directed to be paid in whatever manner by the advice of Hess & Boyle, accountants, in accordance with payments as received by the two stockholders in previous years as bonus and director fees.

The stock certificate shall be signed in blank on this date by the Seller and left in the office of Tom Kelley, attorney, in trust, to be delivered to the corporation on May 1, 1975.

This contract is subject to the granting of the Class C Liquor License to the corporation for the license year commencing May 1, 1975.

The Buyer shall further, on May 1, 1975, give a note to the Seller for the unpaid amount of the total of $100,000.00, and that as a part of the consideration of this sale, Michael L. Cerone shall personally guarantee said note.

The chicken recipe used by the corporation at its restaurant is its sole property, and the Seller agrees not to use this recipe without written permission of the corporation, nor will he disclose it to any other persons.

\*     \*     \*     \*     \*     \*     \*

the corporation agreed that the corporation would redeem petitioner's 50 shares of stock therein for $125,000. The $125,000 was to be paid $25,000 down; the balance of $100,000 was payable over 7 years in equal, semiannual installments due on the first day of May and December of each year, commencing on May 1, 1975, with interest at an annual rate of 6½ percent.

Petitioner and his son intended that the execution of the redemption agreement finalize their arrangement regarding the ownership of the corporation. It did not. Petitioner did not receive the $25,000 downpayment required[10] by the redemption agreement on the date it was signed. Petitioner's son did not bring to the November 7th meeting at Kelley's office a corporate check or any other means by which the corporation could pay petitioner the downpayment. Nevertheless, petitioner and his son (on the corporation's behalf) signed the redemption agreement on November 7, 1974. They agreed to handle the downpayment at the corporation's office.

Even after signing the redemption agreement, petitioner and his son continued to argue over its terms.[11] Thereafter, they had several meetings in which they tried to resolve their differences. At one such meeting on December 27, 1974, petitioner's son brought a corporate check in the amount of $25,000, which was dated that date, in hopes of completing the redemption. However, petitioner and his son started arguing again and did not consummate the redemp-

---

The record does not establish when the above language in regard to the cash in the savings account was stricken out.

[10] The redemption agreement clearly contemplated the payment of a $25,000 downpayment at the time the redemption agreement was executed. It provided that the consideration for petitioner's stock would be: "The total sum of $125,000.00, payable as follows: $25,000.00 down, *receipt of which is hereby acknowledged.*" (Emphasis added.)

It is noted that the total purchase price represented $2,500 per share for petitioner's 50 shares. The $25,000 downpayment would have covered the 10 shares to be sold as of October 1, 1974, according to the terms of the redemption agreement.

[11]The subject of these arguments is not wholly clear. Kelley testified that he thought they mostly had to do with Mick's desire to get petitioner off the business' premises. However, it was apparent to the Court that Kelley had little or no personal knowledge as to what was going on between Mike and Mick at that time. For example, Kelley testified that it was his understanding that petitioner and Mick were living in the upstairs apartment during the negotiations. That was not the fact. Mick never lived in that apartment and Mike did not live there during the years before the Court. Eunice Postma lived in the apartment during the time period in which the gambling raids that precipitated the redemption took place. Kelley could not recall if these arguments concerned the language that was stricken from the redemption agreement. See note 9 *supra.*

tion. Finally, on January 16, 1975, the redemption was finalized. Mick gave petitioner the corporation's $25,000 check dated December 27, 1974, and a promissory note[12] in the amount of $100,000, which represented the balance of the purchase price. In return, petitioner delivered the stock certificate representing his stock in the corporation to Kelley. He also executed a document directing Kelley to deliver the stock certificate to the corporation on May 1, 1975, upon payment of the first installment due under the promissory note on that date.[13]

Although the record does not show exactly when, on or about January 16, 1975, petitioner resigned from his positions as president and director of the corporation. He also relinquished his managerial and check-signing authority. Petitioner's son became the corporation's president. Nancy J. Cerone (Nancy Cerone), then Mick's wife,[14] became the corporation's secretary and treasurer. She also became a director of the corporation.

Petitioner's managerial responsibilities were assumed by Nancy Cerone and Eunice Marty Postma (Eunice Postma). Nancy Cerone had been employed by the corporation since her marriage to petitioner's son in 1967. She had worked full time for the corporation during the 2- or 3-year period before the redemption. Eunice Postma had been employed by the corporation, and its predecessor restaurants at that location, for more than 20 years. After the redemption,

---

[12] The promissory note was executed by petitioner's son in his capacity as president of the corporation and in his individual capacity. The promissory note provided as follows:

PROMISSORY NOTE Omaha, Nebraska January 16, 1975

For a valuabe [sic] consideration, receipt of which is hereby acknowledged, the undersigned, Stockade Cafe, Inc., a Nebraska corporation, and Michael L. Cerone personally, hereby promise to pay to Michael N. Cerone, or order, the sum of $100,000.00, payable over a period of seven years in equal semi-annual payments due on May 1st and December 1st of each year commencing May 1, 1975, with interest at the rate of 6 1/2% per annum on the unpaid balance. The maker shall have the right to pay any sum so long as it does not exceed $30,000.00 in any one year on principal, plus interest.

\* \* \* \* \* \* \*

Petitioner insisted on this promissory note because he thought that it would be easier to sue on a note if payments thereunder were not made.

[13] Although the corporation was not to receive petitioner's stock until May 1, 1975, for convenience we refer to Jan. 1975, as the date the redemption occurred because the parties treated the redemption as being settled on that date and because petitioner relinquished control of his stock on that date. Whether the stock was redeemed on Jan. 16, 1975, or on May 1, 1975, is not determinative of any issue before the Court.

[14] Petitioner's son and Nancy Cerone were married from sometime during 1967 until January of 1983.

Nancy Cerone assumed responsibility for hiring and firing waitresses and other restaurant personnel, as well as some kitchen personnel. She prepared work schedules and the payroll. She also arranged substitutes for absent employees. Eunice Postma helped prepare work schedules and supervised other employees. Petitioner's son continued to handle the responsibilities he had before the redemption. Petitioner's son, Nancy Cerone, and Eunice Postma arranged their schedules so that one of them was always at the restaurant and bar.

The redemption agreement did not provide that petitioner would continue as an employee of the corporation after the redemption. At no time during the negotiations or consummation of the redemption did petitioner and his son enter into any other oral or written agreement that petitioner would continue as an employee of the corporation. Petitioner may have remained away from the restaurant for about a month after January 16, 1975. If so, then approximately 1 month after the redemption, Mick asked petitioner to come back and run the cash register in the restaurant.[15] Petitioner did so.[16]

Petitioner worked full time (between 30 and 40 hours each week) for the corporation in 1975, 1976, and 1977, and at least until sometime during 1978. Thereafter, he worked only part time, usually on Friday and Saturday nights. Petitioner continued to work part time for the corporation at least through 1979 and probably until 1980 or 1981.[17] He

---

[15] The record does not indicate when petitioner stopped working for the corporation. In fact, it is not clear that he did. Portions of the testimony of petitioner and his son imply that petitioner stopped working for the corporation for a period of time and then returned to work approximately 1 month after the redemption, at the son's request. However, none of the witnesses, including petitioner, himself, directly testified that his employment ended and began again. In contrast, there was an abundance of direct testimony and documentary evidence that petitioner resigned from his corporate positions and abdicated his managerial and check-signing authority. Moreover, there was no diminution in petitioner's salary for 1974 and 1975, the years in which his employment might have been interrupted, from his salary for 1973 and 1976, the preceding and succeeding years.

[16] If petitioner or his son had known that petitioner's employment with the corporation after the redemption would create the issues involved in this case, petitioner would not have continued to work for the corporation. Petitioner did not need the job. He could have worked as a painting contractor, as he had before buying the business, and as he did after leaving the corporation's employ. Also, he was receiving the installment payments for his stock. However, the record does not indicate that petitioner or his son sought any tax advice in regard to structuring the transaction. Their attorney, Kelley, was not a tax lawyer, and at the trial he did not know what the tax issues were in this case.

[17] Petitioner testified that he worked part time for about his last 3 years with the corporation. Petitioner also testified that he worked for the corporation until "probably [19]80,

stopped working for the corporation after suffering a heart attack while on vacation in Texas.

During 1975 through 1979, the corporation paid petitioner the following annual salaries:

| Year | Salary |
| --- | --- |
| 1975 | $14,400 |
| 1976 | 14,400 |
| 1977 | 14,474 |
| 1978 | 5,541 |
| 1979 | 3,566 |

The corporation did not pay petitioner any bonuses during these years. The record does not indicate whether petitioner received any salary from the corporation in 1980 and 1981. See note 17 *supra*.

Throughout his employment after the redemption, petitioner's responsibilities primarily involved handling the cash register in the restaurant.[18] During that time period, petitioner's son suffered from a number of physical ailments. He had continuing back problems,[19] sometimes suffered severe migraine headaches, and also had high blood pressure. At some point, he became addicted to prescribed drugs.[20] These physical ailments sometimes caused petitioner's son to be absent from the business.[21] Nonetheless, at

[19]81, somewhere in there." He indicated that his tax returns would show the facts, but his returns for 1980 and 1981 are not in the record. On rebuttal, his son testified that petitioner stopped working for the corporation in the summer of 1979. We find as a fact that petitioner was employed by the corporation at least until the summer of 1979, and probably until 1980 or 1981, about coterminous with the period of the installment payments from the corporation. The son sold the business in 1982.

[18] Petitioner's son testified that petitioner "ran the cash register and the restaurant side" of the business. He also stated that petitioner's job was to "take the money in the cash register, and oh, seat people and so forth." However, Nancy Cerone testified that "petitioner just ran the cash register, and that's all he ever did." She also testified that "sometimes when you run the cash register, you may occasionally [seat people], but there is a hostess there to do that. That wouldn't have been his job, no." Nancy Cerone directly supervised petitioner and other aspects of the restaurant outside of the kitchen after the redemption. Petitioner's son was not directly involved in the day-to-day operations of the restaurant other than the kitchen and the bar. We find that petitioner's responsibilities primarily involved handling the cash register in the restaurant.

[19] Petitioner's son underwent back surgery in July of 1974. This surgery did not alleviate his back problems, although they did improve somewhat.

[20] This may not have occurred until after petitioner stopped working for the corporation. An earlier trial date for this case was postponed because petitioner's son had been hospitalized and was not available to testify at that time.

[21] Petitioner's son testified that he missed 2 or 3 days of work every once in a while but not that often. He stated that he was hospitalized only "a couple of times." Nancy Cerone testified that his health problems interfered with Mick's being active in the business "Quite a bit." However, she also stated that she could not say how many days he normally missed per

no time after the redemption did petitioner exercise any managerial authority in the restaurant or in the bar. Petitioner had no authority to hire and fire personnel nor did his son consult with him regarding any management decisions. When petitioner's son was absent, Nancy Cerone usually took over his responsibilities. Additionally, a number of kitchen employees became experienced enough that they could help with ordering food and other of his duties when petitioner's son was absent from work.

In early 1982, petitioner's son sold the business for over $1 million.[22] The operating assets of the business have been sold. However, the corporation has not yet been dissolved pursuant to Nebraska State law. It is retaining some of its assets until this case is concluded.

During the taxable years in issue, the corporation paid petitioner the following amounts pursuant to the redemption agreement and promissory note:

| Date | Payments designated[1] as principal | Payments designated as interest |
|------|-----------------------------------|-------------------------------|
| Jan. 16, 1975 | $25,000.00 | none |
| June 30, 1975 | 5,754.28 | $3,250.00 |
| Oct. 1975 | 5,941.19 | 3,062.99 |
| May 1976 | 6,134.28 | 2,869.90 |
| Oct. 1976 | 6,333.64 | 2,670.54 |
| Total 1977 | 13,292.00 | 4,717.00 |
| Total 1978 | 14,169.00 | 3,839.00 |
| Total 1979 | 15,105.00 | 2,903.00 |

[1]The corporation and petitioner designated the payments as principal or interest. Although respondent stipulated to the amounts of the payments, he specifically disagreed with their designation as principal or interest.

On the Schedule D (Capital Gains and Losses) attached to their return for each year in issue, the individual petitioners reported as long-term capital gain, under the installment method, a portion of the total payments designated as principal that petitioner received from the corporation

month because "some months he wasn't absent at all." Respondent seems to argue that petitioner was really running the business, because of the son's physical problems, but the record does not support any such contention.

[22] Petitioners have requested the Court to make detailed findings about the 1982 sale, but the son's sale is irrelevant to any issues before this Court. There is no suggestion by respondent that petitioner Michael N. Cerone benefited in any way from the son's 1982 sale of the business.

during such year. The amounts[23] so reported are as follows:

| Year | Long-term capital gain |
|------|------------------------|
| 1975 | $35,227 |
| 1976 | 11,969 |
| 1977 | 12,760 |
| 1978 | 13,602 |
| 1979 | 14,502 |

On the Schedule D attached to their 1975 return, the individual petitioners also included the following statement: "Taxpayer elects to report gain by using the installment method, and agrees to notify IRS if any stock is reacquired within 10 years." On the Schedule B (Dividend and Interest Income) attached to their return for each year in issue, the individual petitioners reported as interest income the total payments designated as interest that petitioner received during that year.

On its return for its taxable year ending September 30, 1975, the corporation claimed an interest deduction in the amount of $5,662. This amount includes the $3,250 payment designated as interest made to petitioner on June 30, 1975. On its return for its taxable year ending September 30, 1976, the corporation claimed an interest deduction in the amount of $7,722. This amount includes the $3,062.99 and $2,869.90 payments designated as interest made to petitioner in October of 1975 and May of 1976, respectively. On its returns for its taxable years ending September 30, 1975 through 1979, the corporation reported gross receipts, deductions for the salary of petitioner's son, and taxable income as follows:

| TYE Sept. 30— | Gross receipts | Son's salary | Taxable income |
|---------------|----------------|--------------|----------------|
| 1975 | $665,839 | $64,950 | $61,470 |
| 1976 | 740,911 | 76,864 | 66,400 |
| 1977 | 807,198 | 105,720 | 53,583 |
| 1978 | 869,549 | 89,750 | 51,169 |
| 1979 | 914,260 | 115,002 | 34,168 · |

---

[23] These amounts were determined by applying petitioner's gross profit ratio on the redemption (96 percent) to the total payments designated as principal he received during the particular year. Petitioner determined his gross profit ratio by subtracting his basis in his stock ($5,000) from the total purchase price for his stock ($125,000) and then dividing the result ($120,000) by the total purchase price.

In statutory notices of deficiency dated November 5, 1979 (for 1974[24] and 1976), August 21, 1981 (for 1975), and August 26, 1982 (for 1977, 1978, and 1979), respondent determined that all of the payments designated as principal that petitioner received during the taxable years in issue were essentially equivalent to dividends and therefore constituted ordinary income rather than long-term capital gain. In a statutory notice of deficiency dated November 5, 1979, respondent determined that the corporation's redemption of petitioner's stock was not a sale but a distribution essentially equivalent to a dividend. He therefore disallowed the interest expense deductions claimed by the corporation for the payments designated as interest made during the corporation's taxable years ending September 30, 1975 and 1976.

## OPINION

Petitioner Michael N. Cerone (petitioner or "Mike") and his son (Michael L. Cerone—the son or "Mick") owned and operated the Stockade Cafe (the corporate taxpayer herein), each owning 50 percent of the stock of the corporation. The father and son had a volatile relationship and frequently disagreed over management decisions. Over the years their disagreements became more serious, and finally they decided one of them should buy the other's interest in the business. Petitioner did not think he could run the business alone, so it was decided that the corporation would redeem all of his stock. After the redemption, petitioner worked at the Stockade Cafe for several years, but he did not exercise any control over the corporation. This case involves the tax treatment of the payments or distributions petitioner received for his stock. Specifically, the issue is whether the distributions are dividends under section 301(a)[25] taxable as ordinary income or payments in exchange for stock under section 302(a)[26] taxable as capital gain. The family attribu-

---

[24] See note 1 *supra*.

[25] Generally, a corporation's distribution of property to a shareholder with respect to its stock is included in the shareholder's gross income to the extent the distribution is a dividend. Secs. 301(a) and 301(c)(1). A distribution is a dividend to the extent it is made out of the corporation's earnings and profits. Sec. 316(a).

[26] Under sec. 302(a), if a corporation redeems its stock and the redemption satisfies the requirements of sec. 302(b)(1), (2), (3), *or* (4), then the redemption is treated as "payment in

tion rules of section 318 play a prominent role in this determination.

To have the distributions treated as payments in exchange for stock under section 302(a), petitioner must bring himself within either section 302(b)(1) or section 302(b)(3). Section 302(b)(1) provides that "Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend." Section 302(b)(3) provides that "Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder." These determinations involve the family attribution rules. According to section 302(c)(1), "Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section." Under section 318(a), certain individuals and entities are treated as owning stock actually owned by certain related individuals and entities. Specifically, under section 318(a)(l)(A)—

An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

\*     \*     \*     \*     \*     \*     \*

(ii) his *children*, grandchildren, and parents. [Emphasis added.]

Unless petitioner can bring himself within some exception to this family attribution rule, he would own 100 percent of the stock of the Stockade Cafe both before and after the redemption. The statutory exception, section 302(c)(2), provides as follows:

(A) In the case of a distribution described in subsection (b)(3), section 318(a)(l) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (*including an interest as officer, director, or employee*), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii)

---

exchange for the stock," and may therefore be taxed as capital gain. If the redemption does not so qualify, then it is treated as a distribution of property subject to sec. 301 (i.e., as a dividend to the extent of the corporation's earnings and profits). Sec. 302(d).

and to retain such records as may be necessary for the application of this paragraph.[27]

[Emphasis added.]

Petitioner's first argument is that the family attribution rules of section 318(a)(l) should be ignored in determining whether the corporation's redemption of his stock satisfies the requirements of either section 302(b)(l) or section 302(b)(3). Without the attribution rules, petitioner says, the redemption satisfies both of those sections. Petitioner's position is that the hostility between him and his son negates or nullifies the family attribution rules of section 318(a)(1). Secondly, petitioner argues that even if the attribution rules apply, the redemption so reduced his economic interests or rights in and control over the corporation that the distribution was not essentially equivalent to a dividend within the meaning of section 302(b)(1).

Conversely, respondent argues that section 318(a)(1) clearly applies in determining whether the redemption satisfies the requirements of either section 302(b)(1) or section 302(b)(3). Respondent contends that under section 318(a)(1)(A)(ii) petitioner is treated as owning all of his son's stock in the corporation. Thus, both before and after the redemption, petitioner actually and/or constructively owned 100 percent of the corporation's stock. This, respondent continues, precludes the redemption from being not essentially equivalent to a dividend within the meaning of section 302(b)(1). Respondent also argues that petitioner's constructive ownership of his son's stock prevents the redemption from satisfying the complete termination of interest requirement of section 302(b)(3). Respondent maintains that there is only one other way the redemption could qualify under section 302(b)(3), that is, if petitioner satisfied the requirements of section 302(c)(2). In such a case, the attribution rules of section 318(a)(1) would not apply, and, the corporation's redemption of all of the stock petitioner actually owned would be a complete redemption within the meaning of section 302(b)(3). Petitioner cannot satisfy the requirements of section 302(c)(2), respondent insists, because peti-

---

[27] Sec. 1906(b)(13)(A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, 1976-3 C.B. (Vol. 1) 1, 310, amended sec. 302(c)(2) by substituting the word "Secretary" for "Secretary or his delegate." The change was effective as of Feb. 1, 1977.

tioner retained an interest in the corporation as an employee in violation of section 302(c)(2)(A)(i).

## I. Family Hostility and the Attribution Rules

Petitioner vigorously argues that the hostility between him and his son should negate or nullify the family attribution rules of section 318(a)(1) in determining whether the corporation's redemption of his stock qualifies for sale or exchange treatment under section 302(b)(1) or section 302(b)(3). Petitioner stresses that the disagreements between him and his son, the corporation's two equal shareholders, increased in frequency and intensity as the years went by. Petitioner also emphasizes that he and his son began negotiating the redemption only after the Omaha vice squad raided the corporation's premises searching for evidence of petitioner's gambling activities, and a representative of the Nebraska Liquor Control Commission warned the son that petitioner might cause the corporation to lose its liquor license. Petitioner points to the numerous heated arguments he had with his son throughout the approximately 1-year period during which they negotiated the redemption agreement. He notes that those arguments continued even after the redemption agreement was signed. He further notes that the redemption was not consummated until approximately 2 months after the signing of the agreement.

Respondent's primary position[28] is that the discord between petitioner and his son does not affect petitioner's constructive ownership of his son's 100-percent interest in the corporation after the redemption. For the reasons stated below, we agree that there is no family hostility exception in this case to the section 318 family attribution rules.

---

[28] Respondent questions whether petitioner and his son exaggerate the hostility that existed between them before the redemption. The Court is inclined to think that they do. Respondent points to their long working relationship. They had worked together for some 12 years before the redemption and continued to work together for at least 5 years after the redemption. Respondent also notes that petitioner did not want to run the corporation's business without his son's help. Clearly, the relationship between Mike and Mick was always volatile and because of Mike's gambling activity had become more so the year before the redemption. The father and son continued to work together during the redemption negotiations, although they were not speaking to each other at times. Thus, we have no doubt that there were arguments and some degree of hostility between petitioner and his son prior to the redemption. Whether this hostility was such as to bring into operation any "family hostility" exception to the attribution rules, we need not decide in this case. For purposes of this case, we assume the existence of the requisite degree of family hostility whatever that may be.

In making his family hostility argument, petitioner acknowledges, as he must, the importance of the Supreme Court's decision in *United States v. Davis*, 397 U.S. 301 (1970). In *Davis*, the Supreme Court held that: (1) The constructive ownership rules of section 318 apply to dividend equivalency determinations under section 302(b)(1); (2) redemptions of stock held by a sole shareholder, including a "constructive" sole shareholder, are always essentially equivalent to a dividend under section 302(b)(1); (3) business purpose is irrelevant in determining dividend equivalency under section 302(b)(1); and (4) in order to avoid dividend equivalency, the redemption must result in a "meaningful reduction" in the shareholder's proportionate interest in the corporation. See, e.g., *Roebling v. Commissioner*, 77 T.C. 30, 50-51 (1981); *Metzger Trust v. Commissioner*, 76 T.C. 42, 52-53 (1981) (Court-reviewed), affd. 693 F.2d 459 (5th Cir. 1982), cert. denied 463 U.S. 1207 (1983); *Benjamin v. Commissioner*, 66 T.C. 1084, 1106 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); *Grabowski Trust v. Commissioner*, 58 T.C. 650, 656 (1972).[29] The Supreme Court made it clear that the attribution rules of section 318 are to be taken into account in determining whether a redemption is essentially equivalent to a dividend. *United States v. Davis*, 397 U.S. at 305-307.

Petitioner correctly observes that the facts in *Davis* did not involve family discord. Thus, the Supreme Court was not required to decide what effect, if any, family hostility has on the application of the attribution rules in the context of section 302. Petitioner cites *Haft Trust v. Commissioner*, 510 F.2d 43 (1st Cir. 1975), vacating and remanding 61 T.C. 398 (1973) and 62 T.C. 145 (1974) (supplemental opinion), as authority for the proposition that family hostility may negate or nullify the attribution rules of section 318 in determining whether a redemption satisfies the requirements of section 302(b)(1) or section 302(b)(3). In *Haft Trust*, the taxpayer-trusts argued that the attribution rules of section 318(a)(1) should not apply when hostility exists among the members of a family. *Haft Trust v. Commis-*

---

[29] See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.24, at 9-29 to 9-34 (4th ed. 1979).

*sioner*, 61 T.C. at 403. We rejected that argument, analyzing the issue as follows:

A careful review of the opinion of the Supreme Court in *Davis* convinces us that the petitioners' argument is inconsistent with the statements and rationale of that opinion. Before the enactment of the 1954 Code, the attribution rules were sometimes applied, and sometimes not applied; to avoid that uncertainty, section 302 expressly made the attribution rules applicable for purposes of determining whether a distribution in redemption should be treated as a dividend. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A96 (1954). The Court relied upon "the plain language of the statute" in concluding that the attribution rules were applicable. 397 U.S. at 306. The Court was obviously convinced that in enacting the rules of section 302, Congress sought to provide definite and specific rules and to avoid the uncertainties which had arisen under the earlier law. * * *

If the applicability of the attribution rules depended upon the feelings or attitudes among the members of a family, it would then be necessary to inquire into whether there was hostility or animosity among them, whether such discord was serious, and whether it would actually or likely impair the ability of one member of the family to influence the conduct of other members. By the terms of the statute, the attribution rules are applicable irrespective of the personal relationships which exist among the members of a family, and an interpretation of the statute which made their applicability depend upon whether there was discord among the members of the family—or the extent of any such discord—would frustrate the legislative objective and would be clearly inconsistent with the language and the rationale of *Davis*. * * * [*Haft Trust v. Commissioner*, 61 T.C. at 403.]

On appeal, the First Circuit analyzed the law differently. The First Circuit construed *Davis* as not requiring that the dividend equivalency inquiry end after taking into account the attribution rules. It pointed out that section 1.302-2(b), Income Tax Regs., only requires that constructive stock ownership caused by section 318 be one of the facts considered in determining dividend equivalency. The First Circuit interpreted *Davis*' meaningful reduction requirement as permitting, if not mandating, an examination of the facts and circumstances to determine the effect of the transaction going beyond a mere mechanical application of the attribution rules. *Haft Trust v. Commissioner*, 510 F.2d at 47, 48. The First Circuit believed that, by retaining the section 302(b)(1) dividend equivalency test as an alternative to the more objective tests of section 302(b)(2) and section 302(b)(3), Congress showed itself willing to tolerate some

administrative and judicial inconvenience brought about by inquiries into "the uncertain shifting quagmires of family relationships" for the sake of taxpayer equity. *Haft Trust v. Commissioner*, 510 F.2d at 48. On the basis of its analysis, the First Circuit vacated our decision and remanded the case for reconsideration of the taxpayer-trusts' claims in light of the facts and circumstances of the case, including the existence of family discord tending to negate the presumption that the taxpayers would exert continuing control over the corporation despite the redemption. *Haft Trust v. Commissioner*, 510 F.2d at 48.

In further support of his family hostility position, petitioner also points to a statement we made in a footnote in *Chertkof v. Commissioner*, 72 T.C. 1113 (1979), affd. 649 F.2d 264 (4th Cir. 1981). The primary issues in that case were the fair market value of a corporate distribution to the taxpayer in redemption of his stock, and whether the redemption constituted a complete redemption under section 302(b)(3). Alternatively, the taxpayer argued that the redemption qualified under section 302(b)(1) as being not essentially equivalent to a dividend. In a footnote addressing this issue, *Chertkof v. Commissioner*, 72 T.C. at 1122-1123 n. 3, we first determined that under the attribution rules of section 318(a)(1)(A)(ii), the taxpayer was the sole shareholder of the redeeming corporation both before and after the redemption. After noting that according to *United States v. Davis*, 397 U.S. at 307 "such a redemption is always 'essentially equivalent to a dividend'" (fn. ref. omitted), we made the following statement upon which petitioner relies:

Furthermore, we recognize that under certain limited circumstances, hostile family relationships have been held to block stock ownership attribution under sec. 318(a)(1) from one family member to another. *Robin Haft Trust v. Commissioner*, 510 F.2d 43, 47-48 (1st Cir. 1975), vacating and remanding 61 T.C. 398 (1973), supplemental opinion, 62 T.C. 145 (1974); *Benjamin v. Commissioner*, 66 T.C. 1084, 1107-1108 (1976); *Estate of Squier v. Commissioner*, 35 T.C. 950 (1961); *Parker v. Commissioner*, T.C. Memo. 1961-176. * * * [*Chertkof v. Commissioner*, 72 T.C. at 1123 n. 3.]

We found that the taxpayer's relationship with his father was not sufficiently hostile to prevent the attribution of his

father's stock to him. Consequently, the taxpayer failed the dividend equivalency test of section 302(b)(1). *Chertkof v. Commissioner*, 72 T.C. at 1123 n. 3.

Relying on the First Circuit's opinion in *Haft Trust* and our acknowledgement thereof in *Chertkof*, petitioner asserts that the attribution rules should not apply herein because the hostility between him and his son precluded petitioner from exercising any control over the corporation after the redemption. However, after the opinions in *Haft Trust* and *Chertkof*, this Court once again analyzed the role of family hostility in the application of the attribution rules and respectfully declined to follow the First Circuit's approach. *Metzger Trust v. Commissioner*, 76 T.C. 42 (1981) (Court-reviewed), affd. 693 F.2d 459 (5th Cir. 1982), cert. denied 463 U.S. 1207 (1983). Petitioner in essence is asking us to reconsider the majority opinion in *Metzger Trust* and to adopt instead an approach suggested in Judge Tannenwald's concurring opinion in that case.

In *Metzger Trust*, the taxpayer-trust relied upon the First Circuit's opinion in *Haft Trust v. Commissioner, supra*, for the proposition that family hostility is a factor to be considered in mitigation of the attribution rules of section 318 in determining dividend equivalency under section 302(b)(1). We again analyzed the legislative history of section 318, and concluded that the end product of the legislative process, the statute itself, makes application of the attribution rules mandatory. *Metzger Trust v. Commissioner*, 76 T.C. at 56-58. We stated as follows:

> The language of the statute is clear. Courts do not have the power to repeal or amend the enactments of the legislature even though they may disagree with the result; rather, it is their function to give the natural and plain meaning to the statutes as passed by Congress. *National Life & Accident Insurance Co. v. United States*, 524 F.2d 559, 560 (6th Cir. 1975); *International Trading Co. v. Commissioner*, 484 F.2d 707, 713 (7th Cir. 1973); *Busse v. Commissioner*, 479 F.2d 1147, 1152 (7th Cir. 1973). Some commentators have suggested that it would be better to ignore the attributions rules where family discord is present. But courts should not attempt to rewrite statutes because they feel that the scheme Congress created could be improved upon. *United States v. Calamaro*, 354 U.S. 351, 357 (1957).
>
> It is not the function of a Court to rewrite or amend a statute in the guise of construing it. It is the Court's duty to construe and apply the statute as it is written; and if this results in inequity to certain

taxpayers, the fault lies in the statute itself and is beyond the power of the Court to correct. *Farmers Tractor & Equipment Co. v. United States*, 224 F. Supp. 391 (E.D. Ark. 1963), appeal dismissed 326 F.2d 971 (8th Cir. 1964). * * * Our judicial function is limited to applying statutes on the basis of what Congress has written, not what Congress might have written. *Youakim v. Miller*, 562 F.2d 483, 487 (7th Cir. 1977).

Although section 318 assumes * * * a "unity of action and of interest within the family which is frequently lacking," a Court should not make an exception to a statutory rule on the basis of that Court's determination that Congress established the rule on the basis of a faulty set of assumptions. *In re Continental Investment Corp.*, 586 F.2d 241 (lst Cir. 1978). [*Metzger Trust v. Commissioner*, 76 T.C. at 59-60. Fn. ref. omitted.]

Although we rejected the taxpayer-trust's argument that family discord could preclude application of the attribution rules, we nonetheless noted that family discord does have a role, albeit a limited one, in testing for dividend equivalency under section 302(b)(1). We reasoned that under *United States v. Davis, supra*, the proper analysis is as follows: First, the attribution rules are plainly and straightforwardly applied. Second, a determination is made whether there has been a reduction in the stockholder's proportionate interest in the corporation. If not, the inquiry ends because, if there is no change in the stockholder's interest, dividend equivalency results. If there has been a reduction, then all the facts and circumstances must be examined to see if the reduction was meaningful under *United States v. Davis, supra*. It is at this point, *and only then*, that family hostility becomes an appropriate factor for consideration. *Metzger Trust v. Commissioner*, 76 T.C. at 61.[30]

The Fifth Circuit affirmed our decision in *Metzger Trust* and the Supreme Court denied certiorari. *Metzger Trust v. Commissioner*, 693 F.2d 459 (5th Cir. 1982), affg. 76 T.C. 42 (1981), cert. denied 463 U.S. 1207 (1983). After analyzing the *Davis* and *Haft Trust* decisions, and the legislative history of section 302(b)(1), the Fifth Circuit concluded as follows:

---

[30] In *Metzger Trust v. Commissioner*, 76 T.C. 42 (1981) (Court-reviewed), affd. 693 F.2d 459 (5th Cir. 1982), cert. denied 463 U.S. 1207 (1983), we used the fact patterns of two revenue rulings as convenient vehicles to illustrate the proper role of family discord in a dividend equivalency determination. Rev. Rul. 75-502, 1975-2 C.B. lll, and Rev. Rul. 76-364, 1976-2 C.B. 91. See 76 T.C. at 63-64. We need not repeat that analysis here, but these examples clearly illustrate one situation where we have indicated that family hostility is relevant to the dividend equivalency determination.

In summary, we believe that the Commissioner and Tax Court were correct in refusing to take family discord into account in applying the attribution rules. When a question is raised as to the dividend equivalency of a redemption, under §302(b)(1) the correct approach is to apply the attribution rules *first*, then to determine whether there has been "a meaningful reduction of the shareholder's proportionate interest," without regard to whether the interest is actually or constructively held. What is "meaningful" then, to borrow a word, is essentially an inquiry into structure, a structure that applies statutorily dictated rules of economic unity. [*Metzger Trust v. Commissioner*, 693 F.2d at 467-468. Emphasis in original; fn. ref. omitted.]

Both this Court's opinion and the Fifth Circuit's opinion in *Metzger Trust* clearly demonstrate that family hostility does not prevent application of the attribution rules. At most, as we suggested in *Metzger Trust*, family hostility comes into play only in determining, *after the attribution rules have been applied*, whether any reduction in stock ownership is meaningful.[31] Nevertheless, petitioner argues that we should abandon the rationale of those opinions, citing Judge Tannenwald's concurring opinion in our *Metzger Trust* case. *Metzger Trust v. Commissioner*, 76 T.C. at 80. While he also concluded that the attribution rules were applicable in *Metzger Trust*, Judge Tannenwald's rationale for that result differed from that of the majority. Reasoning that there was no hostility in any link in the chain of attribution,[32] Judge Tannenwald concluded as follows:

Thus, all of the attribution rules relevant to the instant case accord with reality, and so their application herein is consistent with the rationale behind section 318. We need not decide whether we may or should

---

[31] The Fifth Circuit did not, however, embrace our suggestion that family hostility may be a factor in determining whether a reduction in the stockholder's interest in the redeeming corporation is meaningful. In a footnote, that Court stated as follows:

"The Tax Court in its opinion below did suggest that in cases of non-pro-rata distribution family hostility 'can be a relevant fact to be considered in determining whether the reduction in the shareholder's interest is meaningful so as to qualify the distribution as not essentially equivalent to a dividend under section 302(b)(l).' 76 T.C. 42, 62-63 (1981). That notion is inconsistent with our approach. Regardless, such a case was not presented below or here." [*Metzger Trust v. Commissioner*, 693 F.2d 459, 467 n. 16 (5th Cir. 1982), affg. 76 T.C. 42 (1981), cert. denied 463 U.S. 1207 (1983).]

Similarly, this case does not involve a non-pro-rata distribution. There are only two shareholders, father and son, and under the family attribution rules, the father owns 100 percent of the stock both before and after the redemption.

[32] The chain of attribution in *Metzger Trust* ran from child's trust to child to father to taxpayer-trust. The only hostility present existed between the father and his sisters, to whom the attribution rules did not apply. See *Metzger Trust v. Commissioner, supra*, 76 T.C. at 83.

ameliorate the application of the section 318 rules if justice would be served thereby, and I believe that a proper respect for the judicial function and its inherent limitations requires that we do not decide these questions before they are properly presented. [*Metzger Trust v. Commissioner*, 76 T.C. at 83.]

Judge Tannenwald also commented on the majority's suggestion that family hostility may be considered only in determining whether a reduction in stock ownership is meaningful; that is, only *after* the attribution rules have been applied, the redemption resulted in a reduction in stock ownership, and the only remaining question is whether such reduction is meaningful. He suggested that this order of analysis "paves a road for objectionably arbitrary results." *Metzger Trust v. Commissioner*, 76 T.C. at 84. To illustrate his point, Judge Tannenwald posited the following hypothetical:

Suppose a father and son jointly own a corporation until they have a bitter dispute, at which time the son is completely redeemed. If, before the redemption, they owned in the aggregate 100 percent of the corporation's outstanding stock, they each will be deemed to own 100 percent of the corporation after the redemption. Thus, the rule which the majority feels compelled to adopt would treat the redemption as essentially equivalent to a dividend under section 302(b)(l). However, if a third party (say, an employee) owned as little as 1 share, the redemption would reduce percentage-wise the son's constructive ownership ever so slightly below that of his previous actual and constructive ownership, and thus he would now be free under the majority's rule to argue that the attribution rules should be overlooked because of the family feud. Yet, it seems clear to me that whether or not a third party owns a minimal amount of stock has nothing whatsoever to do with the issue. * * * [*Metzger Trust v. Commissioner*, 76 T.C. at 84. Fn. ref. omitted.]

Petitioner points to Judge Tannenwald's example in support of his argument that the attribution rules should not be applied in this case because the result is objectionably arbitrary. With all due respect to our esteemed colleague, we considered but declined to follow those arguments in *Metzger Trust*. Having respect for the principle of stare decisis, we see no reason to revisit that case.

We acknowledged in *Metzger Trust v. Commissioner*, 76 T.C. at 64, that application of the attribution rules can produce harsh results in certain circumstances. We noted that such was the case in *United States v. Davis*, 397 U.S.

301 (1970). However, we also observed (76 T.C. at 64) that "the Supreme Court has been unwilling to reconsider the harsh effects of the *Davis* decision (*Albers v. Commissioner*, 414 U.S. 982 (1973) (denying certiorari)), thus, we must follow the law." (Fn. ref. omitted.) Moreover, whatever the result in a case involving the facts of Judge Tannenwald's hypothetical, this is not the case.[33] Thus, the hostility between petitioner and his son simply has no effect on the application of the section 318 attribution rules or on our decision in this case.

## II. Section 302(b)(1)—Dividend Equivalency Test

Applying the analysis set forth in *Metzger Trust v. Commissioner, supra,* for determining dividend equivalency under section 302(b)(1) to the facts of this case, we reach the following conclusions: Under the attribution rules of section 318(a)(1)(A)(ii), petitioner owned 100 percent of the corporation's outstanding stock both before and after the redemption. Before the redemption, petitioner directly owned 50 shares. He also constructively owned, under section 318(a)(1)(A)(ii), the 50 shares actually owned by his son. After the corporation redeemed the 50 shares petitioner actually owned, he still constructively owned his son's 50 shares, which then constituted all of the corporation's outstanding stock. Because petitioner is treated as owning 100 percent of the corporation's stock both before and after the redemption, the redemption did not cause any reduction in petitioner's proportionate interest in the corporation. Therefore, the redemption was essentially equivalent to a dividend within the meaning of section 302(b)(1). *Metzger Trust v. Commissioner*, 76 T.C. at 61. As the Supreme Court stated in *United States v. Davis*, 397 U.S. at 307:

After application of the stock ownership attribution rules, this case viewed most simply involves a sole stockholder who causes part of his shares to be redeemed by the corporation. We conclude that such a redemption is always "essentially equivalent to a dividend" within the meaning of that phrase in §302(b)(1) * * *

---

[33] To keep his hypothetical simple, Judge Tannenwald did not consider the possible effect of the provisions of sec. 302(c)(2). 76 T.C. at 84 n. 6. Here sec. 302(c)(2)(A) is involved and will be discussed in the text below.

Despite this clear result, petitioner nevertheless argues that even after applying the attribution rules of section 318, we should find that the redemption was not essentially equivalent to a dividend. To support this position, petitioner begins by quoting the following language from section 1.302-2(b), Income Tax Regs: [34]

The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case. *One of the facts to be considered in making this determination is the constructive stock ownership of such shareholder under section 318(a).* * * * [Emphasis added.]

Petitioner also cites the following passages from *United States v. Davis*, 397 U.S. 301, 311, 313 (1970):

The intended scope of §302(b)(1) as revealed by this legislative history is certainly not free from doubt. However, we agree with the Government that by making the sole inquiry relevant for the future the narrow one *whether the redemption could be characterized as a sale*, Congress was apparently rejecting past court decisions that had also considered factors indicating the presence or absence of a tax-avoidance motive. * * *

* * * * * * *

If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders *without a change in the relative economic interests or rights of the stockholders.* Where a redemption has that same effect, it cannot be said to have

---

[34] Petitioner also points to section 1.302-2(c), Income Tax Regs. It provides as follows:

"In any case in which an amount received in redemption of stock is treated as a distribution of a dividend, proper adjustment of the basis of the remaining stock will be made with respect to the stock redeemed. * * *"

Petitioner contends that this provision supports a finding that the redemption was not essentially equivalent to a dividend. His rationale is that under the regulation if a redemption is treated as a dividend distribution, the taxpayer is entitled to adjust the basis of any remaining stock to reflect the basis of the redeemed stock. The corporation redeemed all of the stock petitioner actually owned. Therefore, petitioner contends, he will not be able to reflect such basis in other stock *as required by the regulation.* Moreover, petitioner complains that he will lose forever his $5,000 basis in the redeemed stock. However, just this type of situation is contemplated by example (2) of sec. 1.302-2(c), Income Tax Regs. It provides as follows:

"H and W, husband and wife, each own half of the stock of Corporation X. All of the stock was purchased by H for $100,000 cash. In 1950 H gave one-half of the stock to W, the stock transferred having a value in excess of $50,000. In 1955 all of the stock of H is redeemed for $150,000, and *it is determined that the distribution to H in redemption of his shares constitutes the distribution of a dividend.* Immediately after the transaction, W holds the remaining stock of Corporation X with a basis of $100,000."

Thus, petitioner's basis in his redeemed stock will not be lost forever. Rather, it will be reflected in an adjustment to the basis of his son's stock in the corporation in accordance with sec. 1.302-2(c), Income Tax Regs.

satisfied the "not essentially equivalent to a dividend" requirement of §302(b)(1). * * *
[Emphasis added; fn. ref. omitted.]

Finally, petitioner reminds us of the following statement made in Haft Trust v. Commissioner, 510 F.2d at 48:

The effect of the transaction rather than its motivation is determinative. Section 302(b)(l) requires a "meaningful reduction of the shareholder's proportionate interest in the corporation," id. [United States v. Davis, supra, 397 U.S. at 313.] (emphasis supplied.) This language certainly seems to permit, if it does not mandate, an examination of the facts and circumstances to determine the effect of the transaction transcending a mere mechanical application of the attribution rules.

Petitioner concludes from these passages that even if the attribution rules apply, and he is therefore treated as owning 100 percent of the corporation's stock both before and after the redemption, we must nevertheless analyze the redemption to determine if it was essentially equivalent to a dividend. According to petitioner, the real question is whether the redemption should be characterized as a sale. He further maintains that in analyzing the redemption we must consider the effect it had on petitioner's economic interests or rights in and control over the corporation.

Petitioner observes that before the redemption, he actually owned 50 percent of the corporation's outstanding stock. Thus, petitioner enjoyed all of the benefits of actual ownership of the corporation. He directly benefited from increases in the corporation's value. Petitioner was also an officer and director of the corporation. Before the redemption, petitioner received total salaries and bonuses ranging from $34,956 in 1971 to $42,060 in 1974. Petitioner also played an active role in managing the corporation's business.

After the redemption, petitioner did not actually own any of the corporation's stock. Thus, he did not receive any of the benefits of actual ownership of the corporation. Increases in the corporation's value no longer inured to his benefit. He resigned from his office and directorship. After the redemption, petitioner's salary as an employee ranged from $14,400 in 1975 to $3,566 in 1979. Petitioner no longer had any voice in management decisions.

Petitioner argues that this drastic reduction in his economic interests or rights in and control over the corporation constitutes a meaningful reduction of his proportionate interest in the corporation. According to petitioner, it fully justifies characterizing the redemption as a sale. Thus, petitioner continues, the redemption was not essentially equivalent to a dividend within the meaning of section 302(b)(1) despite the attribution rules.

The test for dividend equivalency is whether there has been "a meaningful reduction of the *shareholder's proportionate interest* in the corporation." *United States v. Davis*, 397 U.S. at 313. (Emphasis added.) Thus, we must analyze petitioner's relative economic interests or rights in the corporation *as a shareholder*. As discussed at length, *supra*, we must treat petitioner as if he actually owned the 50 shares his son owned after the redemption. In so doing we must attribute to petitioner all of the economic interests or rights in the corporation represented by his son's 50 shares. To do otherwise would, in effect, ignore petitioner's constructive ownership of those shares. As we said in *Metzger Trust v. Commissioner*, 76 T.C. at 61-62:

To treat constructively owned stock different from actually owned stock for section 302(b)(1) purposes would be the same as ignoring the attribution rules in the first place. This is clearly contrary to the plain meaning of the statute and its legislative history.

Under the attribution rules of section 318, petitioner is treated as owning 100 percent of the corporation's stock both before and after the redemption. He is also treated as having the economic interests or rights represented by such stock. Thus, there was no reduction in his proportionate interest as a shareholder in the corporation. Moreover, we think the following observations from *Metzger Trust v. Commissioner*, 76 T.C. at 62, dispose of petitioner's argument that his loss of control over the corporation can help satisfy the meaningful reduction requirement:

Some cases and commentators suggest that where family hostility exists, the concept of "interest" in a corporation can be broken down into two components, ownership and control, for purposes of applying or not applying the attribution rules in determining dividend equivalency. Under such a theory a stockholder, who before the redemption owned 100 percent of a corporation, actually, and who after the redemption owned

no stock, actually, but 100 percent, constructively, could be deemed to have no control over the corporation where the remaining shareholders were unfriendly section 318 relatives or entities. Because his "control" of the corporation went from 100 percent to nothing, the shareholder, according to the theory, had a meaningful reduction in his "interest" in the corporation. This, in effect, ignores the constructively owned stock for the purposes of determining dividend equivalency contrary to the statute, the regulations, the legislative history, and the rule of *Davis*. *Niedermeyer v. Commissioner*, 62 T.C. 280, 285-86 (1974), affd. 535 F.2d 500 (9th Cir. 1976), cert. denied 429 U.S. 1000 (1976). Although the degree of control of a corporation is a factor to be considered in testing dividend equivalency (*Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979)), the final determination must take into account constructively owned stock as well as actually owned stock. Such a position is consistent with the effect of attribution in situations where there is no family discord and where the taxpayer, after the redemption, owned no stock, actually, but 100 percent, constructively. In such cases, courts have held the distribution to be essentially equivalent to a dividend. *Lewis v. Commissioner*, 35 T.C. 71 (1960); *Levin v. Commissioner*, 385 F.2d 521 (2d Cir. 1967), affg. 47 T.C. 258 (1966). [Fn. ref. omitted.]

### III. Section 302(b)(3)—Complete Redemption Test

This case presents the issue of the statutory exception of section 302(c)(2) to avoid the family attribution rules. Section 302(b)(3) provides that a complete redemption of all of the stock of a corporation owned by the shareholder qualifies for exchange treatment under section 302(a). Generally, section 302(c)(1) provides that the attribution rules apply in determining whether the requirements of section 302(b)(3) have been satisfied. However, under section 302(c)(2), the attribution rules of section 318(a)(1) do not apply in the case of a complete redemption under section 302(b)(3) if, inter alia, "immediately after the distribution the distributee has no interest in the corporation (*including an interest as officer, director, or employee*), other than an interest as a creditor." (Emphasis added.)

Petitioner argues that the redemption satisfied the complete termination of interest requirement of section 302(b)(3). His primary basis for this argument is that the attribution rules of section 318 should not apply because of the hostility between petitioner and his son. As discussed at length above, family hostility does not prevent application of the attribution rules. Thus, unless petitioner satisfies the

requirements of section 302(c)(2), petitioner did not completely terminate his interest in the corporation as required by section 302(b)(3).

Respondent argues that there was no complete termination of petitioner's interest because petitioner was an employee of the corporation after the redemption. Thus, respondent contends, petitioner retained a prohibited interest in the corporation within the meaning of section 302(c)(2). According to respondent, this causes the attribution rules to apply (sec. 302(c)(1)), and precludes the redemption from being a complete redemption within the meaning of section 302(b)(3).

This Court recently examined the application of section 302(c)(2)(A)(i) in two cases, one involving an independent contractor and the other involving an employee. *Lynch v. Commissioner*, 83 T.C. 597 (1984); *Seda v. Commissioner*, 82 T.C. 484 (1984) (Court-reviewed). Earlier cases involving claims of a prohibited interest under section 302(c)(2)(A)(i) had involved an interest as an independent contractor or as something other than an officer, director, or employee of the corporation. *Chertkof v. Commissioner*, 72 T.C. at 1124 (interest under a management contract); *Estate of Lennard v. Commissioner*, 61 T.C. 554 (1974) (independent contractor providing accounting services to the corporation after the redemption). Our Court-reviewed opinion in *Seda v. Commissioner, supra*, is the only case in which this Court has squarely faced a claimed prohibited interest as an employee.

In *Seda*, the taxpayers owned all of the outstanding stock of B & B Supply Co. (B & B). The taxpayer-husband, Mr. Seda, was B & B's president and chairman of the board. The taxpayer-wife, Mrs. Seda, was a director, vice president, and secretary of B & B. Because of their deteriorating health, the taxpayers decided to have B & B redeem all of their stock therein. The taxpayers resigned from their positions as officers and directors the same day the redemption was effected. Pursuant to the redemption agreement, B & B also issued 1,000 shares of its stock to the taxpayers' son, who thus was the sole shareholder of B & B after the redemption. Mr. Seda, however, continued to work for B & B after the redemption at a monthly salary of $1,000. Approximately 2 years after the redemption, imme-

diately after learning that his employment relationship could result in the gain from the redemption of his stock being taxed as ordinary income, Mr. Seda terminated his employment relationship with B & B. Mrs. Seda never served as an officer, director, or employee of B & B after the redemption.

In *Seda*, respondent argued that the taxpayers were not entitled to the relief from the family attribution rules provided by section 302(c)(2) because Mr. Seda remained an employee of B & B after the redemption. The taxpayers argued that section 302(c)(2)(A)(i) does not prohibit all employment relationships. They further contended that Mr. Seda's employment after the redemption was not the retention of a prohibited interest in B & B. We disagreed. In concluding that the taxpayers failed to satisfy section 302(c)(2)(A)(i), and that they therefore did not satisfy the requirements of section 302(b)(3) because of their constructive ownership of their son's stock, we stated as follows:

This Court has previously stated that it is reasonable to infer from the legislative history that in enacting section 302(c)(2)(A) Congress was primarily concerned with a situation where a redeeming shareholder retained a financial stake in the corporation or continued to control the corporation and benefit by its operations after making only a nominal transfer of his stock. *Estate of Lennard v. Commissioner*, 61 T.C. 554, 561 (1974).

Although section 302(c)(2)(A)(i) may not prohibit the retention of all employment relationships, *it is clear that the level of employment engaged in by Mr. Seda herein is prohibited.* After the redemption, Mr. Seda continued to work for the company for almost 2 years and received a salary of $1,000 per month. *By receiving that salary, Mr. Seda did retain a financial stake in the company.* Moreover, petitioners have failed to show that Mr. Seda ceased to be involved in the management of the company after the redemption. The fact that petitioners did not know that Mr. Seda's continued employment would prevent them from achieving long-term capital gain treatment is unfortunate, but not controlling. * * * [*Seda v. Commissioner*, 82 T.C. at 488. Fn. ref. omitted; emphasis added.]

Thus, we concluded that Mr. Seda's employment for almost a 2-year period gave him a financial stake in the company which constituted a prohibited interest under section 302(c)(2)(A)(i). [35]

---

[35] Eight judges, in a concurring opinion, thought that in adopting the parenthetical language of sec. 302(c)(2)(A)(i), Congress intended to "prohibit the retention of all employment

*Lynch v. Commissioner, supra,* decided a few months after *Seda,* involved an independent contractor rather than an employee, but reaffirmed the rationale of *Seda.* The taxpayer-husband, Mr. Lynch, was originally the sole shareholder of W.M. Lynch Co. (the company). The taxpayers' son was employed by the company as a salesman. He was also elected a director and officer of the company. Later, Mr. Lynch sold some of his stock in the company to his son. The taxpayers resigned as directors and officers of the company. Shortly thereafter, the company redeemed the rest of Mr. Lynch's stock. At the same time, Mr. Lynch entered into a consulting agreement whereby he agreed to provide such consulting services of an advisory nature as the company might reasonably request. After the redemption, Mr. Lynch performed some services for the company pursuant to a consulting agreement. He received a monthly fee under the agreement. He also received other minor benefits from the company.

Asserting that the true nature of Mr. Lynch's relationship with the company was that of an employee, the Commissioner argued that Mr. Lynch had retained an interest in the company prohibited by section 302(c)(2)(A)(i). The taxpayers argued that under the consulting agreement, Mr. Lynch was merely an independent contractor. After carefully examining the relationship between the taxpayer-husband and the company after the redemption, we determined that the weight of the evidence established that he was *not* an employee of the company after the redemption. In light of that conclusion, we examined the facts and circumstances to determine whether Mr. Lynch had retained a financial stake in the company or continued to control the company after the redemption of his stock and ultimately concluded that he had done neither. 83 T.C. at 605-606, 608. We indicated that such an examination of the facts and circumstances was particularly required "where the interest retained is not that of an officer, director, or employee." 83 T.C. at 605.

---

relationships." They would have applied the per se rule they considered mandated by the statute. The concurring judges questioned the majority's "insistence on judicially legislating this Court into the additional burden of inquiring into the level of employment." *Seda v. Commissioner,* 82 T.C. 484, 490-492 (1984) (Court-reviewed). See generally Rose, "The Prohibited Interest of Section 302(c)(2)(A)," 36 Tax L. Rev. 131 (1981).

Petitioner does not and cannot argue that he was not an employee of the corporation after the redemption of his stock, one of the categories of prohibited interest listed in the statute. Moreover, we conclude on the record as a whole that petitioner's employment relationship with the corporation after the redemption was a prohibited interest within the meaning of section 302(c)(2)(A)(i). *Seda v. Commissioner*, 82 T.C. at 488. Petitioner was employed by the corporation for some 5 and possibly up to 7 years after the redemption. See note 17 *supra*. He received an annual salary of $14,400 or more for the first 3 years. He received lesser amounts for the remaining years, after he began working part time. He stopped working for the Stockade Cafe only after he had suffered a heart attack. Petitioner's length of employment and salary level were greater than those involved in *Seda*. Thus, we find that he retained a financial stake in the corporation prohibited by section 302(c)(2)(A)(i). See *Seda v. Commissioner*, 82 T.C. at 488.

However, unlike the taxpayer in *Seda*, petitioner established that he did not continue to control the corporation after the redemption. See *Seda v. Commissioner*, 82 T.C. at 488. This fact alone does not prevent petitioner's employment relationship with the corporation from being of the type prohibited by section 302(c)(2)(A)(i). The test is whether he retained a financial stake *or* continued to control the corporation. See *Lynch v. Commissioner*, 83 T.C. at 605; *Seda v. Commissioner*, 82 T.C. at 488. Thus, on the facts of this case, section 302(c)(2) does not prevent the application of the attribution rules in testing the redemption under section 302(b)(3). Consequently, the corporation's redemption of petitioner's stock was not a complete redemption within the meaning of section 302(b)(3).

## IV. Conclusion

The corporation's redemption of petitioner's stock failed to satisfy the requirements of either section 302(b)(1) or section 302(b)(3). Thus, the redemption must be treated as a distribution of property to which section 301 applies. See sec. 302(d). Under sections 301 and 316, a distribution of property is treated as ordinary income to the extent it is made out of the corporation's earnings and profits. Secs.

301(a), 301(c)(1), 316(a). Petitioners do not suggest that the corporation's payments to petitioner were not made out of its earnings and profits.[36] Consequently, all such payments are ordinary income to the individual petitioners, and the corporation is not entitled to deduct any portion of such payments as interest.

To reflect the foregoing holdings and the concessions by the parties,

> *Decision will be entered for petitioners for the year 1974, and for respondent for the year 1976 in docket No. 1683-80.*
>
> *Decisions will be entered for respondent in docket Nos. 1684-80, 28696-81, and 27979-82.*

---

[36] Moreover, if petitioners wanted to make such an argument, we would have to hold that they failed to meet their burden of proof on this issue. *Chertkof v. Commissioner*, 72 T.C. 1113, 1126 n. 4 (1979), affd. 649 F.2d 264 (4th Cir. 1981); *Makransky v. Commissioner*, 36 T.C. 446, 453 (1961), affd. 321 F.2d 598 (3d Cir. 1963); Rule 142(a). The corporation's tax returns for its taxable years ending Sept. 30, 1975 through 1979, are in the record. Schedule L (Balance Sheets) to each such return discloses the corporation's retained earnings at the beginning and end of the relevant taxable year. Additionally, respondent requested that we find and we found as facts the corporation's taxable income for each such taxable year. However, neither the corporation's retained earnings nor its taxable income necessarily equals its earnings and profits. See sec. 312. See generally, B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03, at 7-11 to 7-23 (4th ed. 1979). However, in view of the success of the business, it seems likely that there were sufficient earnings and profits to cover the distribution. In any event, petitioners have not argued or proved otherwise.